ROSA ADELINA DÍAZ, demandante y peticionaria, *v.* CARLOS RAFAEL ALCALÁ, demandado y recurrido.

*Número:* CE-93-381          *Resuelto:* 28 de mayo de 1996

960

*Carmen Ibarra Ortega,* abogada de la recurrente; *Rina Biaggi García, Silvia Vilanova Hernández* y *Enid G. Martínez Padilla,* abogadas del recurrido.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Las aportaciones de una sociedad de gananciales para uno de los cónyuges obtener un título profesional (con especialidad y subespecialidad), ¿son bienes gananciales sujetos a inventario y eventualmente colacionables en la liquidación correspondiente?

I

El 12 de julio de 1975, Carlos Rafael Alcalá contrajo matrimonio con Rosa Adelina Díaz. Con la preparación académica que poseía de la Facultad de Ciencias Naturales de la Universidad de Puerto Rico, en agosto se trasladó a

Málaga, España, para comenzar estudios en medicina. Díaz permaneció en la isla trabajando de secretaria y oportunamente gestionó un préstamo federal estudiantil en una institución bancaria. Estas gestiones fueron lentas y complicadas, ya que había que enviar documentos a España, esperar su devolución y, en ocasiones, realizar llamadas de larga distancia para obtener y precisar la información requerida. El préstamo de diez mil dólares ($10,000) fue aprobado en abril de 1976. En mayo se unió a su esposo. En Málaga vivían del dinero del préstamo, de una mensualidad enviada por los padres de Alcalá y de los regalos enviados por familiares.(1) Por prohibición legal española, no podían trabajar.

Mientras su esposo estudiaba, Díaz realizaba las tareas típicas del hogar y le asistía en sus estudios. En ocasiones le buscó los apuntes de las clases que se vendían a los miembros de una cooperativa estudiantil en lugares a veces lejanos; éstos fueron de gran ayuda para los exámenes de él. Además, de las declaraciones juradas de algunos compañeros de clase de Alcalá surge que, en ocasiones, le oyeron decir que su esposa iría a hablar con sus profesores para resolver algunos asuntos relacionados con las clases. En fin, Díaz realizó muchas de las gestiones que, de ordinario, un estudiante tiene que hacer y que le consumen bastante tiempo.

El 16 de agosto de 1977, Díaz solicitó admisión para ella estudiar medicina también, durante el año académico 1977–1978, en la misma facultad donde estudiaba Alcalá. El 17 de febrero de 1978 el Rector de la universidad le informó que su petición había sido rechazada; no obstante, le reservaron "el derecho preferente para efectuar su matrícula el próximo año académico 1978–79". No lo hizo pues estaba embarazada y estimó que entre el cuidado del hijo por nacer, las labores del hogar y otras gestiones, no ten-

---

(1) Este préstamo comenzó a pagarse por la sociedad de gananciales Alcalá-Díaz el 5 de noviembre de 1985.

dría tiempo suficiente. El 7 de agosto de 1978 nació el primer hijo.

El 10 de diciembre de 1981, una vez terminados los estudios de Alcalá, regresaron a Puerto Rico. Al poco tiempo, el 16 de marzo de 1982, nació un segundo hijo. Una vez recuperada, Díaz regresó a su trabajo, ya que era necesario que aportara económicamente al sostén familiar. El 1ro de julio de 1982, Alcalá comenzó su año de internado en el Hospital Regional de Fajardo,([2]) donde devengaba un sueldo nominal para cubrir sus gastos. Díaz residía con sus dos (2) hijos en San Juan; Alcalá, en Fajardo. Ella lo visitaba los fines de semana; limpiaba su apartamento; compraba los alimentos y lavaba su ropa. Concluido el año de internado, el 30 de junio de 1983, Alcalá se trasladó a vivir con su esposa e hijos a San Juan. A partir del 1ro de julio comenzó su residencia en medicina interna en el Hospital Regional de Bayamón. El 25 de octubre nació su tercer hijo. Posteriormente, el 30 de junio de 1986, Alcalá finalizó su residencia y obtuvo el título de medicina interna; comenzó a trabajar por cuenta propia mientras estudiaba para obtener una subespecialidad en neumología. Por su experiencia como secretaria, Díaz realizó las gestiones para que su esposo obtuviera las consultorías, los servicios de proveedor de planes médicos y los privilegios para servir en hospitales. Además, le asistió en la facturación a los planes médicos, redactó cartas y coordinó las citas de sus pacientes. Finalmente, el 30 de junio de 1988, Alcalá logró la subespecialidad en neumología.

Sin embargo, las relaciones conyugales se habían deteriorado sustancialmente. A los cuarenta y seis (46) días de obtener la subespecialidad, Alcalá abandonó el hogar y presentó una demanda de divorcio por trato cruel a su esposa Díaz. Ésta, a su vez, formuló una reconvención en la cual alegó que su esposo mantenía relaciones sentimentales pú-

([2]) El año de internado es un requisito legal, previa la obtención de la licencia para ejercer medicina en Puerto Rico. 20 L.P.R.A. sec. 71.

blicas con otras damas. Ante esta reconvención, el doctor Alcalá desistió de su reclamación en corte abierta y el 4 de octubre de 1989 el Tribunal Superior, Sala de Bayamón (Hon. Ramón A. Buitrago Iglesias, Juez), declaró con lugar la reconvención para decretar la disolución del matrimonio por la causal de trato cruel por parte de él. Concedió la custodia y patria potestad de los hijos menores a su madre. Pocos días después, Alcalá contrajo segundas nupcias.

El 10 de enero de 1990, Díaz solicitó la división y liquidación de los bienes gananciales. Entre los bienes alegados —el equipo médico y una biblioteca, una residencia localizada en Levittown, un apartamento en Fajardo, un automóvil Grand Prix de 1987 y un Honda Accord modelo 1988— reclamó la carrera de medicina, incluso la especialidad y subespecialidad de Alcalá. En su contestación, Alcalá adujo que su carrera no era un bien ganancial que estuviese sujeto a división.

El 25 de junio de 1993 el Tribunal Superior, Sala de San Juan (Hon. Pedro López Oliver, Juez), declaró sin lugar una moción de sentencia sumaria presentada por Díaz. Dictaminó que la carrera de medicina no tenía que incluirse en el inventario de los bienes. A solicitud de Díaz, revisamos.[3]

## II

■ Nuestro Código Civil nos dice que "[l]a palabra *bienes* es aplicable en general *a cualquier cosa* que puede constituir riqueza o fortuna. Esta palabra hace relación al mismo tiempo a la palabra *cosas* que constituye el segundo objeto de la interpretación jurisprudencial, según la cual sus principios y reglas se refieren a las personas, a las

---

[3] En su *certiorari*, como único señalamiento discute que "[e]rró el tribunal de instancia al hacer una interpretación de la ley por la que resulta que una carrera no es un 'bien' según lo define el Código Civil y por lo tanto su adquisición, vigente el matrimonio, no puede reputarse, en ciertos casos, bien ganancial". Petición de *certiorari*, pág. 5.

cosas y a las acciones". (Énfasis suplido y en el original.) Art. 252 (31 L.P.R.A. sec. 1021).([4])

---

([4]) Vázquez Bote apunta:

"... [T]omando en consideración la evolución jurídica, parece existir suficiente base, sin perjuicio de la carencia de rigor que manifiesta el Código civil, para afirmar que la expresión *bienes* es más amplia que la de *cosas*, como dice Planiol. Aunque originalmente la expresión *bien* iba referida fundamentalmente a los objetos corporales, y destacadamente a los inmuebles, el *progreso de la vida jurídica y las modificaciones en la conciencia social le hacen hoy tener un alcance mucho mayor, que comprende todo aquello que sea elemento de fortuna y de riqueza susceptible de apropiación.* En este sentido, los *bienes* comprenden las *cosas* de todas clases: casas, tierras, muebles, créditos, rentas, derechos de autor, patentes de invención, etc. Comprende, pues, junto a las cosas materiales, cierto número de bienes incorporales, que son los derechos.

"No obstante la tradición que acompaña al término *cosa*, se manifiesta en la doctrina extranjera una tendencia a generalizar el término o expresión *bienes*. ...

"Como indica Bonet Ramón:

"Diciendo que la cosa en sentido jurídico debe ser un bien, todavía no se ha dado el concepto amplio y exacto. La categoría de los bienes es muy amplia; existen bienes morales que no entran en el campo del Derecho y tampoco pueden llamarse cosas, de donde nace una segunda determinación del concepto de cosa, y es que ha de ser un bien económico." (Escolio omitido y énfasis suplido y en el original.) E. Vázquez Bote, *Tratado teórico, práctico y crítico de derecho privado puertorriqueño: derechos reales I*, Orford, Ed. Equity, 1991, Vol. VII, págs. 4–5.

Por su parte, Manresa expone:

"... Bueno será recordar, sin embargo, que *por cosa se entiende generalmente un objeto material como tal objeto, e independientemente de cualquier relación que pueda tener con una persona o ser de derecho, mientras que la palabra bienes indica ya que existe apropiación*: diferencia implícita también en el mismo artículo 333, cuando dice 'cosas que son o pueden ser objeto de apropiación'. Cabría pensar que con esto quiere darse a entender que mientras la condición de apropiada no se da en la cosa, el derecho es extraño a ella; pero como la consideración de *bienes* se aplica aquí no sólo a las *apropiadas* (actualmente), sino a todas las *apropiables*, resta por ver si hay alguna *cosa* que, en el mero hecho de serlo, no sea justamente *apropiable*.

.       .       .       .       .       .       .       .

"Como precisa muy bien el profesor Albaladejo, el término 'bienes', en sentido amplio, abarca tanto los bienes patrimoniales como los extrapatrimoniales (vida, libertad, honor, etc.). También 'bien' es palabra que se utiliza por la ley (en el Código Civil, por ejemplo, los artículos 667, 668, 747, 763, 806, 968, 1.023, 1.031, etc.) en el sentido de 'todo elemento patrimonial activo' (no las obligaciones). Pero, nuestro Código frecuentemente habla de 'bien' como sinónimo de 'cosa' en sentido jurídico (por ejemplo: artículos 333 y siguientes, 659, 1.024, etc., e, incluso, a veces dice 'cosas o bienes': art. 346, 1.°). Así, una finca o un mueble son bienes, y a éstos se contraponen las cosas, en sentido vulgar (las estrellas, el aire), que no son bienes (que no son *cosas en sentido jurídico*), *porque no son susceptibles de apropiación* (artículo 333 del Código Civil).

"Sobre este tema también resultan interesantes las matizaciones de Biondi, para quien el término 'cosa' siempre se refiere a una entidad objetiva por sí misma, destacada e independiente de un sujeto, con tal que sea jurídicamente relevante. En cambio, 'bien' reclama la idea de interés, de ventaja, de utilidad y, por tanto, se refiere a un sujeto. La cosa es considerada como entidad objetiva sobre la que se ejercita el derecho subjetivo, y el bien es interés que constituye el contenido del derecho subjetivo." (Escolios omitidos y énfasis en el original.) J.M. Manresa y Na-

968

■ Todos los bienes matrimoniales se reputan como gananciales "mientras no se pruebe que pertenecen privativamente al marido o a la mujer". Art. 1307 del Código Civil, 31 L.P.R.A. sec. 3647. Véase *Universal Funding Corp. v. Registrador*, 133 D.P.R. 549 (1993). En *García v. Montero Saldaña*, 107 D.P.R. 319, 336 (1978), resolvimos que se trata de una presunción controvertible, que " 'siempre cede a la verdad, esto es, a la prueba' ". *Santiago v. Tribunal de Contribuciones*, 69 D.P.R. 305, 309 (1948).

■ A tono con la definición del Art. 252 del Código Civil, *supra*, concluimos que los grados académicos en medicina obtenidos por el recurrido Alcalá, pueden quedar enmarcados dentro de la definición legal de "bienes", pues "constitu[yen] riqueza o fortuna" y son susceptibles de apropiación.

■ No existe controversia en cuanto a que el matrimonio Díaz-Alcalá generó una sociedad legal de gananciales; por ende, se presume el carácter ganancial de estos bienes. La interrogante surge si el título médico y la especialidad o subespecialidad son gananciales o privativos. Prima facie, la respuesta parecería apuntar a la gananciabilidad, pues estos son los "bienes ... adquiridos por título oneroso durante el matrimonio a costa del caudal común, bien se haga la adquisición para la comunidad, bien para uno solo de los esposos [y l]os obtenidos por la industria, sueldo o trabajo de los cónyuges o de cualquiera de ellos". Art. 1301 del Código Civil, 31 L.P.R.A. sec. 3641.

■ No obstante, hay bienes que por su naturaleza personalísima son exclusivos de su titular, aunque para su consecución se hayan destinado fondos del caudal común o empleado la industria, el sueldo o el trabajo de uno o ambos cónyuges. Éstos están tan inextricablemente atados a

---

varro, *Comentarios al Código Civil español*, 8va ed. rev., Madrid, Ed. Reus, 1976, T. III, págs. 17–19.

las cualidades inmanentes a la persona, que no podrían ser calificados propiamente como "gananciales".

Esa es la situación que ocurre con un grado académico. Sabido es que quien lo obtiene lo hace a base de su talento personal innato, capacidad, destrezas y conocimientos adquiridos. El título resultante de ese esfuerzo no tiene ninguna de las características tradicionales de propiedad —no puede ser vendido, cedido, pignorado, etc.— termina con la muerte del titular y no es heredable. Por su naturaleza personalísima, no podemos reconocer al cónyuge no titular un interés propietario en características personales de su consorte.[5]

A fin de cuentas, es innegable que independientemente de la ayuda y el socorro brindados por la peticionaria Díaz, el demandado Alcalá no habría alcanzado de ninguna forma los grados que obtuvo, si no hubiera tenido la capacidad intelectual innata, igual que si no hubiera hecho sacrificios y esfuerzos personales para lograr sus metas académicas.

■ Si bien nuestro Código Civil no señala como privativos o gananciales los derechos patrimoniales inherentes a la persona —entre los que se encuentran los títulos profesionales— su naturaleza, que son consustanciales a su titular, apunta a su carácter privativo. "Afirma Josserand que hay ciertos bienes que se consideran privativos porque repugnan, por su naturaleza misma, a toda puesta en comunidad. La repugnancia, explica, puede atribuirse bien a la incesibilidad del crédito *o a su carácter personal*." (Énfasis suplido.) *Maldonado v. Tribunal Superior*, 100 D.P.R. 370, 375 (1972).

■ Aunque no hay una expresión categórica en nues-

---

(5) Se ha aceptado casi unánimemente en diversas jurisdicciones norteamericanas que los grados profesionales no son propiedad marital y no están sujetos a distribución en equidad (*equitable distribution*). De veinticuatro (24) jurisdicciones que han considerado el asunto, veintidós (22) así lo han resuelto. *Martinez v. Martinez*, 818 P.2d 538, 541–542 (Utah 1991).

tro ordenamiento a los efectos de que los bienes personalísimos son privativos,[6] dicha conclusión puede derivarse, según la doctrina española, del texto del Art. 1064 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3028 (equivalente al Art. 1.111 del Código Civil español), que dispone:

> Los acreedores después de haber perseguido los bienes de que esté en posesión el deudor para realizar cuanto se les debe, pueden ejercitar todos los derechos y acciones de éste con el mismo fin, exceptuando los que sean inherentes a su persona; pueden también impugnar los actos que el deudor haya realizado en fraude de su derecho.

Comenta Castán que, incluso antes de la actual redacción del citado artículo del Código de España, "la doctrina los consideraba privativos [a los bienes] como consecuencia

---

[6] Nuestro Código Civil, en su Art. 1299 (31 L.P.R.A. sec. 3631), de similar redacción al derogado artículo 1.346 del Código Civil español, no incluye en el catálogo de los privativos los bienes y derechos patrimoniales inherentes a la persona. Así, nuestro estatuto dispone:

"Son bienes propios de cada uno de los cónyuges:

"(1) Los que aporte al matrimonio como de su pertenencia.

"(2) Los que adquiera durante él, por título lucrativo, sea por donación, legado o herencia.

"(3) Los adquiridos por derecho de retracto o por permuta con otros bienes, pertenecientes a uno solo de los cónyuges.

"(4) Los comprados con dinero exclusivo de la mujer o del marido." 31 L.P.R.A. sec. 3631.

La redacción actual del Art. 1.346 del Código Civil español, en su acápite quinto, incluye como privativos "los bienes y derechos patrimoniales inherentes a la persona".

Se ha señalado que "[a] base de lo resuelto en *Robles Ostolaza v. UPR*, supra, entendemos que la educación habría que catalogarla como un bien privativo e inherente al cónyuge que la posee, independientemente de que la adquisición se haya efectuado durante la vigencia del matrimonio y con aportaciones gananciales. En este sentido coincidimos con lo expresado en *In re Marriage of Graham*, supra, a los efectos de que la educación es personal de quien la posee, no es hereditaria, es intransferible, no puede comprarse, y es el producto acumulativo de años de educación unido a la diligencia y esfuerzo del estudiante". A.L. Muñoz Colón, *La educación obtenida durante el matrimonio: bien privativo o bien ganancial susceptible de división en caso de divorcio*, 32 Rev. Der. P.R. 59, 72 (1992).

En *Robles Ostolaza v. U.P.R.*, 96 D.P.R. 583 (1968), resolvimos que la indemnización que en concepto de daños y perjuicios se concede a una persona casada es privativa, ya que tiene el efecto de reparar un perjuicio personal.

Es justo consignar que el legislador español ha trazado igual correlación, pues clasifica como privativos, en el acápite sexto, "el resarcimiento por daños inferidos a la persona de uno de los cónyuges o a sus bienes privativos".

del artículo 1.111 del Código civil, pues así como no son susceptibles de ejercicio por los acreedores, ni generalmente de transmisión *inter vivos,* tampoco pueden serlo de comunicación entre los cónyuges". (Escolio omitido.) J. Castán Tobeñas, *Derecho Civil español, común y foral,* 10ma ed., Madrid, Ed. Reus, 1983, T. V, Vol. 1, págs. 386–387. Véanse, *in pari materia:* M. Albaladejo, *Comentarios al Código Civil y compilaciones forales,* Madrid, Ed. Rev. Der. Privado, 1984, T. XVIII, Vol. 2, págs. 107–108; J.L. Lacruz Berdejo y F. Sancho Rebullida, *Derecho de Familia,* Barcelona, Ed. Bosch, 1982, pág. 414.

## III

Los criterios aquí plasmados, en lo referente a la no gananciaidad del título médico del recurrido Alcalá, no tienen el efecto, sin embargo, de privar de unos remedios justos a la recurrente Díaz.

Antes de delinear sus contornos, esbozaremos algunas alternativas,(7) con la aclaración de que hemos de adoptar aquellos remedios que no contravengan la esencia ni trastoquen principios fundamentales de nuestro ordenamiento respecto del régimen legal de gananciales y los efectos de un divorcio.

De entrada rechazamos estimar el valor total de las ganancias que la profesión médica le haya generado al recurrido Alcalá —utilizamos para ello los criterios esbozados en *Suro v. E.L.A.,* 111 D.P.R. 456, 461–468 (1981)— y que "pague" a su excónyuge la mitad de ese valor en un pago global (*lump sum*). Y es que la mera posesión de un grado académico no genera ingresos; depende de los esfuer-

---

(7) Para una discusión general de las variadas opciones de compensación, véanse: E.J. Mayer, *For Richer or Poorer-Equities in the Career-Threshold, No-Asset Divorce,* 58 Tul. L. Rev. 791 (1984); F. Cabello Domínguez, *Hasta que el diploma nos separe ... Los títulos profesionales y su inclusión en la disolución del vínculo matrimonial,* 28 Rev. Jur. U.I.A. 53 (1993).

zos posteriores realizados por quien lo ostenta. Como a la fecha del divorcio no se habían efectuado estos esfuerzos que, en realidad, son los que le dan valor al grado, estimarlos sería un ejercicio demasiado especulativo. Además, razones prácticas y de equidad impiden esta solución, ya que estaríamos imponiéndole una carga económica insostenible al recurrido Alcalá; desembolsar dinero sin haberlo devengado. Requeriríamos que, contrario a nuestra doctrina, divida con su ex esposa aquellos ingresos obtenidos *luego de disuelto el matrimonio*. Sabido es que los ingresos obtenidos por un ex cónyuge, luego de decretado el divorcio por sentencia final y firme, son privativos de ese cónyuge. Art. 105 del Código Civil, 31 L.P.R.A. sec. 381; *García v. Montero Saldaña*, supra. La sociedad legal de gananciales concluye una vez el matrimonio es disuelto por divorcio. *Calvo Mangas v. Aragonés Jiménez*, 115 D.P.R. 219, 228 (1984); *García López v. Méndez García*, 102 D.P.R. 383, 395 (1974).

Hemos explorado el posible remedio a la peticionaria Díaz, en términos de su lucro cesante. Éste ha sido definido como la interrupción, disminución o cese en los ingresos de una persona debido a que otra, mediante un acto culposo o negligente, ocasionó la pérdida, total o parcial, de su capacidad productiva. Sustituye, pues, los ingresos dejados de percibir por una persona y presupone, además, su existencia al momento del mencionado acto. No es necesario que el perjudicado demuestre con certeza absoluta que devengaría esos ingresos; basta con que establezca la probabilidad razonable de tal ingreso en el futuro. H.M. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. I, pág. 474.

La compensación por lucro cesante está inexorablemente vinculada con la dependencia económica al momento de la muerte o el evento interruptor. *Zurkowsky v. Honeywell, Inc.*, 112 D.P.R. 271, 275 (1982). Véanse, ade-

más: *Velázquez v. Ponce Asphalt*, 113 D.P.R. 39 (1982); *Suro v. E.L.A.*, supra; *Colón v. Municipio de Orocovis*, 100 D.P.R. 1009 (1972).

Como vemos, el lucro cesante *sustituye* los ingresos generados por el trabajo, que se han dejado de percibir por motivo de un acto culposo o negligente; presupone la existencia de ingresos al momento de ese acto. Aunque por su naturaleza reparadora se trata de un mecanismo atractivo para utilizarse para compensar a la peticionaria Díaz, su inexorable relación con el derecho de daños y la existencia de un acto *culposo o negligente* que hubiese ocasionado la interrupción, terminación o disminución de los ingresos previos de la pareja, nos impide seguir esa ruta decisoria.

■ Ante esta disyuntiva, coincidimos con la *sentencia* de este Tribunal de que procede reconocer y otorgar a Rosa Adelina Díaz, como cónyuge no titular, la mitad de las aportaciones económicas provenientes del peculio común que fueron destinadas a sufragar los estudios que redundaron eventualmente en los títulos profesionales de Carlos Rafael Alcalá.[8] En la medida en que dichas aportaciones fueron hechas a costa de los bienes gananciales, deberán incluirse en inventario y eventualmente colacionarse en la liquidación de los bienes de la comunidad. Ello armoniza con el Art. 1317 de nuestro Código Civil:

> El inventario comprenderá numéricamente, para colacionarlas, las cantidades que, habiendo sido pagadas por la sociedad de gananciales, deban rebajarse del capital del marido o de la mujer.
> También se traerá a colación el importe de las donaciones o enajenaciones que deban considerarse ilegales o fraudulentas, con sujeción a la sec. 3672 de este título. 31 L.P.R.A. sec. 3692.

---

[8] Se reembolsarán los gastos directos de tipo educativo, tales como enseñanza, libros y matrícula, así como otras contribuciones razonablemente relacionadas con la educación, como lo son los gastos de mantenimiento del cónyuge sostenido (*living expenses*). A modo ilustrativo de los gastos susceptibles de ser compensados, véase la parte (c) de los comentarios al Art. 121 del Código Civil de Louisiana.

■   Este curso de acción no es nuevo. Lo hemos empleado constantemente en el contexto de las pensiones de retiro de un empleado[9] que, aunque de distinta naturaleza a la adquisición de un título profesional, tiene unas características esenciales comunes a esto último, las cuales requieren que se les trate de igual manera cuando se trata de colación y de liquidación de los bienes gananciales.

■   Tanto las pensiones por retiro como los títulos profesionales son *bienes personalísimos*, no susceptibles de transmisión a otra persona. No obstante, hemos sido consecuentes —en el contexto de las pensiones de retiro— en reconocer como gananciales las aportaciones que se efectúen para la consecución del beneficio, a costa del caudal común. No vemos razón alguna para aplicar una lógica distinta en este caso.[10]

---

[9] En *Maldonado v. Tribunal Superior*, 100 D.P.R. 370, 377 (1972), expresamos que "no empece al modo de adquisición, el derecho a la anualidad por retiro es uno personalísimo que nunca acrece el haber común. Conviene, sin embargo, notar una distinción entre el derecho en sí y las cantidades abonadas mensualmente en virtud de ese derecho. Estas tienen más bien el carácter de frutos civiles, lo que determina su clasificación como un bien ganancial mientras se perciba durante el matrimonio. Art. 1303 del Código Civil, 31 L.P.R.A. sec. 3643. Véase, además, Manresa, IX, *Comentarios al Código Civil Español*, págs. 200–203. A *contrario sensu*, una vez disuelto el vínculo matrimonial, dichas cantidades sólo acrecen el patrimonio del titular del derecho de pensión". Véanse, además: *Benítez Guzmán v. García Merced*, 126 D.P.R. 302 (1990); *Delucca Román v. Colón Nieves*, 119 D.P.R. 720 (1987). Además, la sociedad de gananciales tiene derecho a un crédito por el importe total de dichas aportaciones al momento de su disolución. *Rosa Resto v. Rodríguez Solís*, 111 D.P.R. 89, 93 (1981).

[10] Aunque entendemos que nuestro ordenamiento jurídico impone claramente la conclusión aquí adoptada, es justo consignar, a modo ilustrativo, la tendencia en Estados Unidos que concede al cónyuge que ayuda a su consorte a obtener algún grado profesional una compensación equivalente a la *ayuda económica* que le brindó durante sus estudios. Véanse: *Maloney v. Maloney*, 524 N.Y.S.2d 758, 759–760 (1988); *McGowan v. McGowan*, 518 N.Y.S.2d 346 (1987); *Van Busson v. Van Busson*, 728 S.W.2d 538 (Ky. App. 1987); *Drapek v. Drapek*, 503 N.E.2d 946 (1987); *Cronin v. Cronin*, 502 N.Y.S.2d 368 (1986); *Lehmicke v. Lehmicke*, 489 A.2d 782 (1985); *O'Brien v. O'Brien*, 498 N.Y.S.2d 743 (1985); *Jones v. Jones*, 454 So. 2d 1006 (1984); *In re Marriage of Sullivan*, 691 P.2d 1020 (Cal. 1984); *Woodworth v. Woodworth*, 337 N.W.2d 332 (1983); *Pyeatte v. Pyeatte*, 661 P.2d 196 (Ariz. 1983); *Severs v. Severs*, 426 So.2d 992 (1983); *Hernandez v. Hernandez*, 444 So. 2d 35 (1983); *In re Marriage of Lundberg*, 318 N.W.2d 918 (1982); *Scott v. Scott*, 645 S.W.2d 193 (1982); *De La Rosa v. De la Rosa*, 309 N.W.2d 755 (1981); *Inman v. Inman*, 578 S.W.2d 266 (1979); *In re Marriage of Horstmann*, 263 N.W.2d 885 (1978); *Divorce, Separation and the Distribution of Property*, sec. 9.02[4], págs. 9–25; *Comentario, Should Your Spouse be Com-*

# IV

■ Por último, no podemos convenir con el criterio de la peticionaria Díaz a los efectos de que le corresponde esa compensación por sus sacrificios en términos de su colaboración, esfuerzo y aportaciones, tales como dedicarse al hogar, criar los hijos, hacerle gestiones en la universidad a su marido, etc. Dispone el Art. 88 del Código Civil, 31 L.P.R.A. sec. 281, que "[l]os cónyuges están obligados a vivir juntos, guardándose fidelidad y socorrerse mutuamente". Inmediatamente, preceptúa el Art. 89 (31 L.P.R.A. sec. 282):

> Los cónyuges deben protegerse y satisfacer sus necesidades mutuamente en proporción a sus respectivas condiciones y medios de fortuna. Véase, además, *Deynes v. Texaco (P.R.), Inc.*, 92 D.P.R. 222, 225, 226 (1965).

Acoger su contención abriría las puertas, en los pleitos de divorcio, a contabilizar cada acto espontáneo que sea producto de la dinámica de la relación conyugal. Sus sacrificios, esfuerzos, apoyo moral y cualquier otra ayuda brindada a su marido es lo que se espera de los cónyuges.[11] Rechazamos la visión que asemeja el matrimonio a una

---

*pensated for Putting You Through School? Texas Say No; Is that Just and Right*, 20 St. Mary's L. J. 897 (1989).

La contribución ideada por estos tribunales se logra básicamente "mediante el reembolso directo de los gastos de educación, con intereses más ajuste por inflación, o mediante la consideración de la aportación para la adjudicación de una pensión alimenticia". (Escolio omitido.) Muñoz Colón, *supra*, págs. 67–68.

Para una discusión de la alternativa denominada "pensión remuneratoria", véase *Mahoney v. Mahoney*, 453 A.2d 527 (1982).

En el citado artículo de Muñoz Colón se señala que los estados de California y Louisiana han adoptado estatutos que disponen reducciones en compensación para casos en que la comunidad se haya beneficiado. Muñoz Colón, *supra*, pág. 70.

[11] Para una tesis similar a la aquí esbozada, véase Muñoz Colón, *supra*, pág. 65:

"Entendemos que, el cónyuge que ha hecho aportaciones económicas para ayudar al otro a obtener la educación podría, si aporta la prueba necesaria, recobrar esas aportaciones. Hay que recordar lo dispuesto en el Artículo 1295, 31 LPRA Sec. 3621, que se recobrará la mitad, al disolverse el matrimonio.

"Asimismo entendemos, a base de lo antes expuesto, que solamente se podría recobrar de lo aportado, la cantidad numérica de la aportación hecha a la educación del cónyuge-estudiante. No visualizamos que pueda incluirse en esa cantidad la ayuda moral y espiritual brindada por el cónyuge-trabajador.

*profesión.* Ella es contraria a su esencia y a la dignidad humana.

Además, luego de la obtención del título médico por su marido, la demandante Díaz se benefició directa y tangiblemente de los logros de éste, pues mejoraron sus ingresos, los disfrutó y, además, adquirieron posteriormente los otros bienes y ganancias que fueron objeto de la liquidación en el Tribunal Superior, gracias al esfuerzo de ambos cónyuges.

Puntualizamos en que este dictamen no revoca de forma alguna casos previos en materia de la liquidación de bienes gananciales. Sólo aclara que un título profesional obtenido durante el matrimonio es un bien personalísimo del cónyuge recipiente —dimanante de unas cualidades inherentes a su persona— pero su consorte es acreedor a la mitad de las aportaciones efectuadas con dinero ganancial para la consecución de tal título. Hemos decidido análogamente en el contexto de las pensiones de retiro.

Ahora bien, en cuanto al valor de ciertos bienes adquiridos durante el matrimonio y relacionados con la práctica de la profesión resultante del título personalísimo adquirido, no cabe duda de que se rige por nuestras leyes y nuestra jurisprudencia sobre las liquidación de los bienes gananciales. Tanto los ingresos generados por la práctica de esa profesión, como los bienes y beneficios adquiridos con dinero ganancial —como local de oficinas, mobiliario, equipo, etc.— corresponden a la sociedad de gananciales y su valor en superávit se dividirá conforme lo exige la ley.([12])

---

"No creemos que deba hacerse una proyección de la ganancia futura a los fines de compensar al cónyuge-trabajador, abonándole una cantidad por la expectativa en la ganancia futura. Una determinación a estos efectos sería altamente especulativa y demasiado onerosa para el futuro del cónyuge que obtuvo la educación."

([12]) Esta situación no es ajena a nuestro ordenamiento. A modo de ejemplo, el Art. 1313 del Código Civil, 31 L.P.R.A. sec. 3672, dispone, en lo pertinente, que "[e]l cónyuge que se dedicare al comercio, industria o *profesión* podrá adquirir o disponer de los bienes muebles dedicados a esos fines, por justa causa, sin el consentimiento del otro cónyuge. No obstante, será responsable por los daños y perjuicios que pudiere ocasionar por dichos actos a la sociedad legal de gananciales. Esta acción se

■ Resolver, como lo hacemos, que el título profesional es personalísimo, dista mucho de redundar en perjuicio para el cónyuge no titular. Atribuirle gananciabilidad a un bien inextricablemente atado a las cualidades inherentes de la persona tendría la inevitable consecuencia de prolongar, ad perpetuam, la vigencia de la sociedad de gananciales, haciéndole "coexistir" con futuras sociedades de gananciales. Ello es contrario a nuestro ordenamiento jurídico. Por esa razón, es perfectamente lógico y comprensible que, luego del divorcio, el cónyuge titular pueda beneficiarse particular y exclusivamente de los frutos de su gestión profesional, mientras no inicie una nueva sociedad.

■ Por último, los remedios aquí reconocidos en nada menoscaban el derecho sobre los alimentos *post divorcio* a que pueda ser acreedora la peticionaria Díaz al amparo del Art. 109 del Código Civil, 31 L.P.R.A. sec. 385, según enmendado por la Ley Núm. 25 de 16 de febrero de 1995.

De vigencia inmediata, su texto nuevo modifica sustancial y significativamente el alcance y la visión legislativa de la pensión *post* divorcio. Dispone:

Si decretado el divorcio por cualesquiera de las causales que establece el [Artículo 96] de este [código,] cualesquiera de los ex cónyuges no cuenta con suficientes medios para vivir, el Tribunal Superior podrá asignarle alimentos discrecionales de los ingresos, rentas, sueldos o bienes que sean de la propiedad del otro cónyuge.

El Tribunal concederá los alimentos a que se refiere el párrafo anterior, teniendo en cuenta, entre otras, las siguientes circunstancias:

(a) Los acuerdo a que hubiesen llegado los ex cónyuges;

(b) La edad y el estado de salud;

(c) La cualificación profesional y las probabilidades de acceso a un empleo;

(d) La dedicación pasada y futura a la familia;

(e) La colaboración con su trabajo en las actividades mercantiles, industriales o profesionales del otro cónyuge;

---

ejercitará exclusivamente en el momento de la disolución de la sociedad legal de gananciales". (Énfasis suplido.)

(f) La duración del matrimonio y de la convivencia conyugal;

(g) El caudal y medios económicos y las necesidades de uno y otro cónyuge;

(h) Cualquier otro factor que considere apropiado dentro de las circunstancias del caso.

Fijada la pensión alimenticia, el juez podrá modificarla por alteraciones sustanciales en la situación, los ingresos y la fortuna de uno u otro cónyuge. La pensión será revocada mediante resolución judicial si llegase a hacerse innecesaria, o por contraer el cónyuge divorciado acreedor a la pensión nuevo matrimonio o viviese en público concubinato. (Énfasis suplido.) 31 L.P.R.A. sec. 385.

Se observa, pues, que la Asamblea Legislativa actualizó el precepto y a la luz de *Millán Rodríguez v. Muñoz*, 110 D.P.R. 610 (1981), *eliminó* el lenguaje discriminatorio por razón de sexo en la adjudicación de alimentos, de manera que cualesquiera de los ex cónyuges pueda ser acreedor de ellos. También *descartó* la limitación de que la pensión no podía exceder la cuarta parte de los ingresos, las rentas o los sueldos, *erradicó* el criterio de culpa e *incorporó* ocho (8) circunstancias valorativas para, a modo de elementos de prueba, nutrir la conciencia del juzgador al fijar el monto de la pensión. Véase M. Fraticelli Torres, *Un nuevo acercamiento a los regímenes económicos en el matrimonio: la sociedad legal de gananciales en el Derecho puertorriqueño*, 29 (Núm. 2) Rev. Jur. U.I.A. 413 487–488 (1995).

Según su historial legislativo, este enfoque respondió a los señalamientos expuestos en la ponencia del Departamento de Justicia.

... [L]a concesión de alimentos al ex cónyuge debe basarse en otros criterios de la culpa; *criterios más afines con la situación real con que se confrontan las partes*. Hasta ahora, los criterios tradicionales están basados en la necesidad del alimentista y los recursos económicos del obligado. Se recomendó y, a estos efectos se adicionó un segundo párrafo al Artículo 109, que se enumeren *algunas* circunstancias que podrá también tomar en consideración el juez en la determinación de alimentos al ex cónyuge, similar al caso del Artículo 97 del Código Civil español.([4]) Ello contribuirá a orientar la discreción judicial y *a satisfacer las necesidades de los ex cónyuges sobre las bases*

*reales en que está cimentada la institución del matrimonio en la actualidad.*

---

(⁴) De acuerdo al nuevo ordenamiento positivo español que incorpora la institución del divorcio, se tiene derecho a una pensión que se fijará en la resolución judicial cuando la separación o divorcio produzca desequilibrio económico en relación con la posición de uno de los cónyuges, que implique un empeoramiento en su situación anterior en el matrimonio. Además se establece que en la resolución judicial se fijarán las bases para actualizar la pensión y las garantías para su efectividad. (Énfasis suplido.) Informe del Departamento de Justicia a la Comisión de lo Jurídico Civil de la Cámara de Representantes sobre el P. del S. 652, 26 de septiembre de 1994, 12ma Asamblea Legislativa, 3ra Sesión Ordinaria, págs. 6–7.

Una rápida ojeada de la glosa española revela las controversias parlamentarias que generaron las enmiendas a base de las cuales, finalmente, se redactó su texto. E. Fosar Benlloch, *Estudios de Derecho de Familia,* Barcelona, Ed. Bosch, 1982, T. II, Vol. 1, págs. 377–386. Al criticarlo como "ilusorio", nos dice "que se ha querido establecer una congelación del rango económico para el cónyuge separado o divorciado que tenía en su anterior matrimonio, y hacerlo participar en la eventual prosperidad del cónyuge más aventajado económicamente". Fosar Benlloch, *op. cit.,* pág. 403.

Sin embargo, con razón se ha defendido su texto final como un acto de *justicia equitativa legislativa* que trasciende la antigua noción de divorcio por culpa.

... El divorcio moderno —Ancel le llama "el otro divorcio"— ya sea divorcio remedio, divorcio quiebra o divorcio acuerdo, intenta remitirse a las convenciones de las partes. ¿Pero, y si faltan éstas? El problema ha preocupado seriamente a los autores. Aunque se contempla sin *formalismo y sin sanción, el divorcio nuevo no se inspira en un individualismo separatista que no tendría otro objeto que devolver la antigua libertad a los antiguos esposos, borrando de un golpe el pasado.* Manifiesta, por el contrario, la preocupación, no tanto dirigista como ha pretendido alguno, cuanto de protección, de asistencia, y de nuevo, *de equidad,* que parece bien expresiva del espíritu de esta legislación nueva. Fosar Benlloch, *op. cit.,* pág. 389.

El catedrático español Gabriel García Cantero concluye, "parece que el legislador está contemplando la hipótesis de la mujer casada bajo el régimen de gananciales que ha dedicado su vida al hogar y carece de una especialización profesional, cuya situación económica va a sufrir, presumiblemente, grave deterioro con el divorcio". Albaladejo, *op. cit.*, T. II, pág. 431. Al analizar específicamente los criterios para fijar la cuantía, expone lo siguiente, que por su pertinencia al caso transcribimos *in extenso*:

3.ª) *La cualificación profesional y las probabilidades de acceso a un empleo.* Esta circunstancia ha de jugar, en la práctica, casi *siempre en beneficio de la mujer* que, sin una calificación profesional, o habiendo renunciado a su ejercicio, *se ha dedicado plenamente a las labores domésticas* y, de repente, se ve enfrentada con un divorcio, acaso no querido, y que quizá encomienda a su cuidado la guarda de los hijos menores. No creo que baste con una aptitud genérica a trabajar (siempre hay demanda de mano de obra para los puestos de trabajo más duros y peor remunerados), sino en concreto para la persona determinada del cónyuge, con su especialización o falta de especialización, con su nivel de vida y entorno socioeconómico que el legislador protege (no parece equitativo, por ejemplo, que la mujer de un médico se ponga a trabajar como empleada del hogar); la situación generalizada de desempleo también ha de ser tenida en cuenta por el juzgador. ...

4.ª) *La dedicación pasada y futura a la familia.* Factor muy digno de tener en cuenta para fijar el monto de la pensión es la asunción posdivorcio de las cargas familiares, aunque, en principio, la pensión de alimentos que ha de fijar la sentencia de divorcio atiende financieramente a esas finalidades. Obsérvese que aquí el legislador introduce un dato no exclusivamente económico en la valoración del monto de la pensión, pues por *dedicación* hay que entender no sólo la actividad laboral o profesional encaminada a obtener ingresos para hacer frente a las necesidades del hogar, sino la atención total prestada a la familia, quizá en circunstancias excepcionales (cónyuge enfermo asistido por el otro; cónyuge en paro o imposibilitado de trabajar por cualquier causa, asumiendo el otro el sostenimiento de la familia). *En estos casos en que el sacrificio de uno ha sobrepasado lo normal, parece justo compensarle de alguna manera con una notable pensión por desequilibrio.* En cuanto a la futura dedicación a la familia, ello exigirá al Juez una delicada

valoración prospectiva, para la que, acaso, carezca de datos suficientes.

5.ª) *La colaboración con su trabajo en las actividades mercantiles, industriales o profesionales del otro cónyuge.* Es una circunstancia que no figuraba en el P. G. y que fue introducida en la Ponencia del Congreso. A propósito de ella, observa Grosliére, *que puede darse el caso de una esposa que ha ayudado a su marido en sus comienzos profesionales, compartiendo con él las dificultades iniciales, produciéndose el divorcio cuando aquél ha logrado el éxito del que va a beneficiarse otra mujer; concluye el citado autor francés que sería particularmente injusto* que esta mujer, incluso aunque fuese culpable de ciertos incumplimientos de los deberes conyugales, *no participe de una forma u otra en ese triunfo profesional que, en parte, es obra suya.* Dejando aparte lo que de típicamente galo pueda haber en la observación recogida, hay que decir que el precepto español tanto puede beneficiar a la mujer como al marido —aunque, en principio, parece destinado a la primera—, y que no debe interpretarse restrictivamente, incluyéndose también en su texto las actividades artísticas, deportivas, etc. En todo caso, se trata de una circunstancia que admite fácil traducción a términos monetarios (sueldo de un pasante, de una secretaria, etc.). (Escolio omitido y énfasis suplido y en el original.) Albaladejo, *op. cit.,* págs. 433–435.

Idéntica orientación sigue el Magistrado C.M. Estremera Klett en su obra *Matrimonio, separación y divorcio: legislación actual y en la historia,* 2da ed., Pamplona, Ed. Aranzadi, 1984, págs. 577–578:

4. La dedicación pasada y futura a la familia constituye otro de los elementos orientativos que da la Ley a la hora de fijación de la pensión. *Es indiscutible que una persona —normalmente la mujer— que se ha entregado durante X años al cuidado del esposo y de los hijos, ha perdido la época en la que pudo desarrollar sus cualidades intelectuales y profesionales, sacrificio que ha hecho gustosa, pero que no puede, en pura equidad, irrogarle un desvalimiento en los casos de crisis conyugal.* De otra parte, si sobre uno de los esposos recae, tras la separación o el divorcio, el cuidado y la atención de varios hijos, no ofrece duda que su libertad y sus posibilidades de desenvolvimiento autónomo son menores que las que disfruta su ex-consorte y ello debe ser compensado en pura justicia. Puede estimarse que este apartado constituye un eco de la idea divorcio-sanción, *pero el principio de justicia distributiva tiene que primar sobre los demás.*

5. Otra circunstancia a valorar es: La colaboración con su trabajo en las actividades mercantiles, industriales o profesionales del otro cónyuge. La entrega al desenvolvimiento de una empresa familiar, la colaboración que no suele estar remunerada —aunque pueda haber estado en el pasado—, debe ser compensada por el juez, enfrentado a las crisis conyugales, en el momento de fijación de esa pensión, consecuencia de la separación o el divorcio, *quien tiene que ponderar lo que supone para el consorte separado de la empresa —que hasta ese instante estimó suya— una pérdida de haberes no recibidos, la cual debe ser compensada, pues de no hacerse así se produciría un enriquecimiento sin causa en beneficio del consorte que se mantiene al frente de dicha empresa.* La Ley 11/1981, de 13 de mayo, que modifica el Código civil en materia de filiación, patria potestad y régimen económico del matrimonio, aporta interesantes novedades en relación al punto que nos ocupa. Véanse, además: A. Arza, *Remedios jurídicos a los matrimonios rotos*, Bilbao, Ed. Pub. U. Deusto, 1982, págs. 120–122 y 130–133; A.J. Pérez Martín, *Derecho de Familia*, Valladolid, Ed. Lex Nova, 1995, pág. 83.

Esta breve incursión a la glosa española, referente a los criterios que ahora privan (en cuanto al derecho de pensión post divorcio de un cónyuge, en virtud de la enmienda al Art. 109 del Código Civil, *supra*), revela que el reclamo de la peticionaria Díaz de participar económicamente en la práctica de la carrera y profesión médica de su ex cónyuge el doctor Alcalá, valorizada al momento de disolverse la sociedad legal de gananciales, es improcedente. Sus cualificaciones ocupacionales y probabilidades de acceso de empleo, sacrificios y dedicación a sus hijos, su hogar y su marido, y la colaboración de su trabajo como estudiante y profesional médico —en unión a su edad, estado de salud, duración del matrimonio y el caudal, medios y necesidades— *precisamente serán los elementos de juicio judiciales para fijar el monto de cualquier pensión post divorcio.*[13]

---

[13] Para un análisis crítico de esta nueva legislación, véase R. Serrano Geyls, *La nueva ley de pensiones alimenticias post-divorcio*, 30 Rev. Jur. U.I.A. 97 (1996).

## V

Ante este diseño legislativo de reciente cuño, no creemos que, vía interpretación judicial, el Tribunal deba trastocarlo para incorporar y extender tales criterios a la normativa sobre aval, inventario y liquidación de la sociedad legal de gananciales Alcalá-Díaz.

Aun así, puntualizamos la complejidad de la controversia ante nos. Las relaciones humanas suscitan algunas situaciones que, en rigor científico, no encajan prístinamente en determinado precepto jurídico que ofrezca una solución categórica. En esas instancias, los tribunales *evitamos los extremos* y hacemos acopio de nuestro más granado sentido de justicia y equidad, atemperado a los diversos principios jurídicos establecidos que conforman nuestro sistema.

Más allá de la controversia de autos, corresponde al Legislador ejercer su poder constitucional de perfilar, delinear y redactar leyes para evitar aquellas situaciones humanas y vivenciales que se proyectan reiterada y prominentemente. Éstas, por sus propias fuerzas dinámicas, repetidamente desembocan en conflictos que ameritan un tratamiento estatutario. Este presente recurso tiende así a perfilarse. *Cumplido nuestro deber adjudicativo, compete a la Asamblea Legislativa dar forma estatutaria, de manera integral, a reclamos alternos como al de autos.*

*Se dictará sentencia revocatoria.*

El Juez Asociado Señor Fuster Berlingeri emitió una opinión concurrente. La Juez Asociada Señora Naveira de Rodón emitió una opinión disidente. El Juez Asociado Señor Rebollo López no intervino.

— O —

Opinión concurrente emitida por el Juez Asociado Señor Fuster Berlingeri.

El caso de autos presenta una situación difícil que exige de nuestro Foro lograr un balance adecuado entre importantes intereses contrapuestos. Por un lado, tenemos que atender el justo reclamo que hace una esforzada cónyuge, abandonada por su marido a los pocos días de éste haber obtenido un título profesional que ella le ayudó a conseguir. Por otro lado, también tenemos el deber de sostener unos importantísimos principios de derecho que existen para proteger la muy fundamental institución del matrimonio.

En este caso en particular, le hacemos justicia a la cónyuge no titular, al otorgarle, en la liquidación de la sociedad de gananciales, un crédito por la mitad de las aportaciones económicas provenientes del peculio común, que fueron destinadas a sufragar los estudios del esposo. Me parece que para atender la nueva situación que este caso presenta, debemos proceder con la mayor circunspección para así lograr a cabalidad el delicado balance que estimo necesario entre los referidos intereses en conflicto.

La complejidad del problema que encaramos en este caso surge, como ya se ha mencionado, de la obligación que tenemos de no trastocar la institución matrimonial. Jurídica y moralmente los cónyuges están obligados en el matrimonio a socorrerse mutuamente y a satisfacer sus respectivas necesidades. Son éstos los deberes elementales que recíprocamente tienen la esposa y el esposo. *Deynes v. Texaco (P.R.), Inc.*, 92 D.P.R. 222 (1965). Al menos idealmente, los cónyuges se unen en matrimonio para levantar una familia y para constituir entre sí una relación personal de singular intimidad, y de este modo lograr el pleno desarrollo humano de cada cual. Se trata de una unión que presupone compromisos de desprendimiento y de abnega-

ción, asumidos consciente y voluntariamente, y que para muchos tiene incluso un carácter sacramental. Por ello, de ordinario, los esfuerzos de cualquiera de los cónyuges por amparar y asistir al otro no pueden considerarse como "créditos monetarios" que hayan de contabilizarse al momento del divorcio. Atentaría contra la esencia misma de la institución matrimonial reducir de ese modo lo que se hace por solidaridad y afecto conyugal.

Por otro lado, comúnmente los esposos, que conocen sus particulares circunstancias antes de casarse, constituyen un nuevo ente a través del matrimonio, una especial sociedad de bienes a la que le corresponde el sostenimiento de ambos cónyuges. Ello incluye el pago de la generalidad de los gastos contraídos por cualquiera de éstos, mientras estén casados. De ordinario, los costos incurridos por cualquiera de los cónyuges en su propio mejoramiento personal y profesional es claramente una obligación de la sociedad que constituyen. Dicha sociedad existe en gran medida precisamente para atender el mejoramiento de las personas que la integran y los desembolsos comunales que se hacen a tales fines, por su propia naturaleza, no pueden considerarse como "créditos monetarios" a contabilizarse al momento del divorcio. Cualquier intento de excluir costos de esta índole de la responsabilidad común, tiende a debilitar el sentido y propósito de la sociedad comunal.

No obstante lo anterior, no podemos negar que en ocasiones existen cónyuges que abusan clara y crudamente de la buena fe del otro. Explotan la comunidad de bienes para su exclusivo beneficio personal, carentes de la solidaridad que le da a la unión matrimonial su singular significado. Nuestro ordenamiento debe tener la flexibilidad necesaria para atender tales situaciones, pero ello debe ocurrir sólo de manera *excepcional*; es decir, en casos extremos, en los cuales la patente injusticia sufrida por un cónyuge justifique apartarse de los fundamentales supuestos normativos que rigen y sostienen la institución matrimonial. Además,

deben estar presentes determinadas condiciones que limiten las excepciones que han de efectuarse a las fundamentales normas que de ordinario serían aplicables.

En casos como el de marras, algunas de esas condiciones serían las siguientes:

1. Que el título profesional en cuestión sea uno que mejore claramente la capacidad económica del cónyuge titular; es decir, su capacidad para generar ingresos.

2. Que el cónyuge recipiente del crédito no se haya beneficiado del título profesional en cuestión.

3. Que el crédito aludido se refiera a las aportaciones *especiales* hechas por el cónyuge no titular estrictamente a la educación del que obtuvo el título.

Creo menester enfatizar, además, que no debe suponerse que lo que hemos hecho en este caso puede extenderse fácilmente a otras situaciones que parezcan ser similares. Sobre todo, no debe considerarse que esta decisión abre las puertas para nuevas reclamaciones, en las cuales estén en juego las aportaciones de un cónyuge, no sólo para la obtención de títulos profesionales, sino para cualquier otra condición o circunstancia suya que aumente su capacidad para producir ingresos. Después de todo, los cónyuges con frecuencia se ayudan no sólo a obtener títulos profesionales que puedan resultar lucrativos, sino también, por ejemplo, a organizar negocios o a obtener posiciones o cargos especiales, que también resulten lucrativos. Debe quedar meridianamente claro que lo que resolvemos en este caso es aplicable estrictamente a la particular situación ante nos. De otro modo, estaríamos abriendo una ominosa "caja de Pandora", que puede dar lugar no sólo a una caótica desnaturalización de la institución matrimonial, sino también a la inmanejable tarea de intentar evaluar o cotizar monetariamente todas las múltiples aportaciones y beneficios, de muy variada índole, que los cónyuges han hecho y derivado del matrimonio mientras este duró.

— o —

Opinión disidente emitida por la Juez Asociada Señora Naveira de Rodón.

Nuevamente enfrentamos un asunto novel, que es producto de los profundos cambios socioeconómicos en un mundo que cada vez se torna más pequeño y competitivo, al aumentar y mejorar los medios de transportación y de comunicación masiva y al escasear las oportunidades y los recursos. Estos cambios han alterado significativamente la vida de las familias, tanto su estructura como las funciones y los deberes de sus integrantes. Por ende, surgen controversias en derecho que nos obligan a atemperar nuestro sistema e idea de justicia a la realidad cotidiana.

En el caso de autos nos toca determinar si el título y la licencia profesional obtenidos por uno de los cónyuges durante el matrimonio es un bien ganancial o privativo, y, de ser un bien privativo, cuáles de las aportaciones hechas por el cónyuge no titular se le habrán de reconocer a éste como créditos colacionables al momento de la liquidación de la sociedad de bienes gananciales.

La posición que hoy adopta la mayoría de este Tribunal no constituye el balance más justo y racional de los intereses involucrados, especialmente los del cónyuge no titular. El dictamen de la mayoría no toma en consideración que, en casos como el de autos, al liquidarse la sociedad de bienes gananciales "[l]a sociedad puertorriqueña moderna impone el reconocimiento de otros valores intangibles que pueden significar los elementos económicos vitales para un matrimonio, y en caso de disolución, constituir para uno sólo de los cónyuges una atribución de valor incalculable, y para el otro la pérdida considerable de recursos económicos y la renuncia a oportunidades, casi siempre acompañada de frustración en las expectativas humanas, sociales, afectivas y económicas que el matrimonio representó". M. Fraticelli Torres, *Un nuevo acercamiento a los regímenes eco-*

*nómicos en el matrimonio: la sociedad legal de gananciales en el Derecho puertorriqueño,* 29 (Núm. 2) Rev. Jur. U.I.A. 413, 485, (1995).

El balance de los intereses en juego impone una revisión de los preceptos que rigen la liquidación de la sociedad conyugal y el desarrollo de esquemas que atiendan adecuadamente las necesidades y expectativas de ambos cónyuges frente a la disolución de su matrimonio, tomando en consideración las realidades de nuestra sociedad contemporánea.

Por esto, hoy, como en muchas otras ocasiones, me veo precisada a disentir y a repetir las palabras del ex Juez Presidente de este Tribunal, Don José Trías Monge: "Todavía la desigualdad persigue a la mujer. Aún queda por hacerle verdadera justicia." *Los Derechos de la Mujer,* 40 Rev. C. Abo. P.R. 49 (1979).

I

En el caso de autos, la demandante Rosa Adelina Díaz presentó ante el Tribunal de Primera Instancia, Sala Superior de San Juan, una demanda de división de bienes gananciales. En ésta alegó que contrajo matrimonio con el demandado, Carlos Rafael Alcalá, el 12 de julio de 1975 y se divorció el 2 de noviembre de 1989. Expresó, además, que durante el matrimonio adquirieron los bienes gananciales siguientes: (*a*) la carrera de medicina, incluyendo especialidad y subespecialidad; (*b*) el equipo médico y una biblioteca; (*c*) una residencia localizada en Vía del Sur, Núm. SA-9, Mansión del Sur, Levittown; (*d*) un apartamento en Dos Marinas, Torre II, en Fajardo, y (*e*) dos (2) automóviles, un Grand Prix de 1987 y un Honda Accord de 1988.

Luego de una serie de trámites procesales, la demandante presentó una moción de sentencia sumaria parcial interlocutoria acompañada de varios documentos. Solicitó

que se resolviese la cuestión de derecho siguiente: "¿constituye un bien susceptible de valoración económica la profesión de médico, la especialidad en medicina interna y subespecialidad en neumología obtenida por el demandado mientras se encontraba casado con la demandante?". El 25 de julio de 1993 el foro de instancia resolvió que "[a]ún asumiendo como ciertos los hechos alegados por la parte demandante en su moción de sentencia sumaria, [consideraba] que no le [asistía] la razón". Ordenó no incluir en el inventario de los bienes de la sociedad de gananciales la carrera de medicina, la especialidad y la subespecialidad del demandado doctor Alcalá.

Inconforme con esta determinación, la demandante recurrió ante nos para alegar que el foro de instancia erró "al hacer una interpretación de la ley por la que resulta que una carrera no es un 'bien' según lo define el Código Civil y por lo que su adquisición, vigente el matrimonio, no puede reputarse, en ciertos casos, bien ganancial". Decidimos revisar y expedimos el recurso.

## II

Primero, es necesario repasar los hechos según surgen de la moción de sentencia sumaria y de los documentos que la acompañan ya que, para propósitos de resolver dicha moción, el foro de instancia los tomó como ciertos.(1)

Alega doña Rosa Adelina que cuando contrajo matrimonio en julio de 1975 trabajaba como secretaria en la Cooperativa de Seguros de Vida de Puerto Rico. El demandado, por su parte, acababa de completar su bachillerato en la Universidad de Puerto Rico. Ese mismo mes, éste se trasladó a Málaga, España, para cursar estudios en

---

(1) En su alegato la parte recurrida alega que sólo dos (2) hechos son incontrovertibles: que el demandado cursó su carrera de medicina y que obtuvo su título de médico durante el matrimonio. En cuanto al resto de los hechos alegados por la demandante en su moción de sentencia sumaria, expresa que éstos "son en su mayoría falsos o no enteramente correctos".

medicina. Doña Rosa Adelina permaneció en Puerto Rico algún tiempo después de la partida de su esposo, trabajando y efectuando los trámites necesarios para que le concedieran a éste un préstamo federal que les permitiera sufragar sus estudios en España. Este préstamo lo comenzaron a pagar, vigente el matrimonio, y es uno de los que el demandado recurrido incluye en la lista de pasivos que pesan sobre la comunidad de bienes y que es objeto de esta liquidación.

En 1976 la demandante se reunió con su esposo en España, y en 1978 nació su primer hijo. Mientras estuvieron en España ninguno de los dos (2) pudo trabajar debido a una prohibición específica de la ley española. Vivieron del préstamo federal, de una mensualidad que les enviaban los padres del demandado y de los regalos esporádicos de la familia de la demandante. Durante el tiempo que permanecieron en España, la demandante trabajó en el hogar y en el cuido de su hijo. También ayudó al demandado en su labor académica. Entre otras cosas, le buscaba apuntes y notas y hablaba con los profesores sobre asuntos relacionados con los exámenes de su esposo. En otras palabras, ella realizó todo el trabajo que tiene que llevar a cabo un estudiante, que no es propiamente estudiar, pero que resulta imprescindible efectuar para tener éxito en los estudios.

En 1977 la demandante solicitó admisión para estudiar medicina en la misma facultad que su esposo. Su solicitud fue rechazada para el año académico 1977–1978, pero le indicaron que le reservaban "el derecho preferente para efectuar matrícula el próximo año académico 1978–1979". No se aprovechó de esto. Decidió que el hogar se vería afectado adversamente. En otras palabras, le dio prioridad al cuidado de su hijo recién nacido y a la preservación del ambiente adecuado en el hogar para facilitar a su esposo su labor académica.

En 1981 la familia regresó a Puerto Rico y en 1982 nació su segundo hijo. Cuarenta (40) días después del naci-

miento, la demandante comenzó a trabajar para sostener el hogar y así lo continuó haciendo, ininterrumpidamente, hasta la fecha del divorcio. De 1981 a 1988 el demandado sólo recibió un sueldo nominal que le suplía el Gobierno para sus gastos. Durante estos años la demandante cuidó de su hogar y de sus hijos mientras trabajaba fuera para sostenerlos. Mientras su esposo hacía su internado en Fajardo, la demandante se pasaba los fines de semana con él. Le limpiaba el apartamento, hacía la compra, lavaba su ropa y realizaba cualquier gestión que hubiese que hacer en San Juan relacionada con los estudios de su esposo.

En 1983 nació un tercer hijo. Ya para 1986 el demandado había obtenido su diploma en medicina interna y había comenzado a trabajar por su cuenta mientras estudiaba para la subespecialidad en neumología. Mientras tanto, la demandante, además de cuidar del hogar y trabajar fuera, ayudaba a su esposo en la etapa incipiente de su práctica. Por ejemplo, le gestionaba servicios de proveedores de diferentes planes médicos, consultoría y privilegios de hospital. Además, lo ayudaba a facturar a los planes médicos, redactar cartas y coordinar citas, entre otras cosas.

Cuarenta y seis (46) días después de que su esposo obtuvo la subespecialidad en neumología, éste abandonó el hogar y presentó la demanda de divorcio por trato cruel. La demandante reconvencionó y finalmente, el 4 de octubre de 1989, el tribunal dictó una sentencia de divorcio a favor de la demandante por la causal de trato cruel.

Pasemos ahora a examinar la opinión suscrita por una mayoría de este Tribunal.

### III

La opinión que hoy emite la mayoría de este Tribunal, partiendo de la base de que los grados académicos en medicina obtenidos por el demandado, doctor Alcalá, son bie-

nes que por su naturaleza personalísima son exclusivos de su titular, concluye "que procede reconocer y otorgar a Rosa Adelina Díaz, como cónyuge no titular, la mitad de las aportaciones económicas provenientes del peculio común que fueron. destinadas a sufragar los estudios que redundaron eventualmente en los títulos profesionales de Carlos Rafael Alcalá". Opinión mayoritaria, pág. 972. Específicamente reconoce el crédito por las aportaciones económicas, o sea, aportaciones susceptibles de adjudicársele valores cuantificables, tales como "los gastos directos de tipo educativo, tales como enseñanza, libros y matrícula, así como otras contribuciones razonablemente relacionadas con la educación, como lo son los gastos de mantenimiento del cónyuge sostenido (*living expenses*)". Íd., pág. 972, esc. 8.

El alcance de este dictamen rechaza la idea de que existen otros valores intangibles que pueden representar elementos vitales para un matrimonio, y que son aportaciones compensables. Entiende la mayoría que reconocer y valorizar las aportaciones indirectas no económicas, tales como el relevo de deberes en el hogar, la manutención de los hijos procreados, la renuncia de expectativas de avance profesional y el retiro del mercado de trabajo, así como la cooperación prestada en labores relacionadas con la obtención de la carrera de medicina, con especialidad y subespecialidad, del demandado doctor Alcalá, está en pugna y contraviene las disposiciones de nuestro Código Civil, específicamente el Art. 89 (31 L.P.R.A. sec. 282), el cual dispone que "[l]os cónyuges deben protegerse y satisfacer sus necesidades mutuamente en proporción a sus respectivas condiciones de fortuna".

Concluye la opinión que los grados académicos en medicina obtenidos por el demandado, doctor Alcalá, son bienes que por su naturaleza personalísima pertenecen exclusivamente a su titular, aun en aquellos casos en que para su consecución se hubiesen destinado fondos del caudal común o empleado la industria, el sueldo o el trabajo de uno

o de ambos cónyuges. En consecuencia, determina que procede otorgar a la recurrente, como parte de la liquidación de los bienes gananciales, sólo la mitad de las aportaciones económicas provenientes del peculio común que fueron destinadas a sufragar los estudios que redundaron eventualmente en el título profesional de su cónyuge. Estimamos incorrecta e injusta esta posición. Veamos.

## IV

Sobre el asunto que nos ocupa, opino que son sumamente acertadas las expresiones de la profesora Fraticelli Torres:

> Se nos ocurre pensar en los daños y perjuicios que el matrimonio provoca en muchas ocasiones a un cónyuge, casi siempre la mujer, que renuncia a las mismas oportunidades del hombre, se retira de la vida productiva para atender el hogar, a los hijos, al marido, y al culminar el matrimonio se encuentra fuera del mercado de trabajo o sin capacidad para generar ingresos propios. Se nos ocurre pensar en las mujeres, en no pocas ocasiones, que para permitir que el compañero termine su título o impulse la idea comercial de sus sueños dedican toda su energía al sostenimiento solitario del hogar y luego no recogen el fruto de su cosecha.
>
> La naturaleza personalísima de las licencias profesionales, del ejercicio de una carrera, del derecho moral de autor y del disfrute de la creación intelectual, son indiscutibles, pero la gestión de apoyo, la asunción solitaria de responsabilidades que de ordinari[o d]ebieron ser compartidas, las privaciones de desarrollo y la depreciación del valor de capacidades individuales para integrarse al mercado del trabajo, son factores que deben ser considerados al momento de determinar a quién, cómo y hasta cuándo beneficia el valor económico de esos derechos personalísimos. Cuando la empresa matrimonial se convierte en campo fértil para el florecimiento del potencial de uno sólo de los cónyuges, y la disolución representa la privación de las fuentes de sustento, y la depresión del prestigio y estado social para el otro, existe una desigualdad que el derecho debe atender. Fraticelli Torres, *supra*, págs. 486–487.

Estamos de acuerdo con la mayoría del Tribunal en que el título en medicina, con especialidad y subespecialidad,

obtenido por el recurrido es un bien personalísimo y participa de una naturaleza privativa. La conclusión anterior, sin embargo, no está reñida con el reconocimiento a la recurrente de otros valores intangibles que arrojen un crédito razonable y equitativo y, que a su vez, reflejen la verdadera aportación hecha por la recurrente en la consecución del bien privativo que hoy disfruta su ex cónyuge. Tampoco impide que se valore la práctica de la profesión de medicina de su entonces esposo y se le reconozca un crédito en ésta.(²)

Para que el doctor Alcalá pudiese obtener el bien privativo que constituye su título profesional de doctor en medicina, con especialidad en medicina interna y subespecialidad en neumología, durante muchos años, su entonces esposa, doña Rosa Adelina, no sólo trabajó para ayudar a sostener económicamente a la sociedad de gananciales, sino que también cuidó y proveyó para los hijos del matrimonio. Relevó a su esposo totalmente de sus deberes como copartícipe de dicha sociedad, llegando incluso a postergar sus propias aspiraciones de estudiar medicina para atender la totalidad de las responsabilidades del hogar y a ayudar a su esposo en las gestiones relacionadas con sus estudios de medicina. Para proporcionarle a su esposo un

---

(²) Esta aseveración encuentra apoyo en el Art. 1304 del Código Civil, 31 L.P.R.A. sec. 3644, el cual prescribe lo siguiente:

"Las expensas útiles, hechas en los *bienes peculiares* de cualquiera de los cónyuges mediante anticipaciones de la sociedad o por la *industria del marido o de la mujer, son gananciales*. (Énfasis suplido.)

Nos apunta, con relación a este artículo, Manresa que el "[c]apital o industria social que se emplea en interés de los bienes privativos de cualquiera de los cónyuges, no se pierde, se transforma en un crédito también ganancial contra el cónyuge que se trate". Conforme al tratadista, el artículo "comprende todo gasto que produzca utilidad o aumento de valor a los bienes de los cónyuges, *en cualquier concepto que sea*, ya constituya verdadera mejora útil o de mero recreo, ya consista en reparaciones no ordinarias, esto es, reparaciones que no constituyan una carga u obligación de la sociedad, *o en cualquier otro beneficio no obligatorio*". (Énfasis suplido.) J.M. Manresa y Navarro, *Comentarios al Código Civil español*, 6ta ed., Madrid, Ed. Reus, 1969, T. IX, pág. 708.

A base de este articulado podemos sostener que al cónyuge no titular puede reconocérsele un crédito por la industria invertida en la consecución y el mejoramiento de un bien intangible privativo del otro cónyuge, como lo es en el caso de autos el título de medicina obtenido por el recurrido.

ambiente en el hogar que le permitiese lograr sus metas profesionales, doña Rosa Adelina desatendió el desarrollo de sus capacidades individuales para reintegrarse y competir con éxito en el mercado del trabajo. Todos estos sacrificios los realizó para que su esposo lograra terminar sus estudios de medicina general, con su especialidad y subespecialidad y luego estableciera su propia oficina. Todo ello con la expectativa justificada de que sus sacrificios a la larga serían compensados con un mejor nivel de vida para la familia. Su ayuda fue instrumento clave en el éxito de su cónyuge; le proporcionó a éste un bien privativo que, sin lugar a dudas, será instrumento clave en su progreso socioeconómico.

La fórmula que hoy adopta el Tribunal, lejos de reflejar un balance equitativo de los intereses en conflicto, ignora, excluye y resta valor a las funciones que usualmente llevan a cabo las mujeres para que sus cónyuges progresen y así la familia también. La posición de la mayoría aparenta estar fundamentada, en parte, en una interpretación arcaica del Art. 89 del Código Civil, *supra,* que no toma en consideración la realidad de las funciones y los deberes de los integrantes de la sociedad conyugal con relación a la economía familiar en la sociedad puertorriqueña moderna. Además, hace caso omiso a los cambios conceptuales producidos por la Reforma del Derecho de Familia de 1976, específicamente de la Ley Núm. 51 de 21 de mayo de 1976 (31 L.P.R.A. secs. 284, 286, 3661, 3671–3672 y 3717), que estableció, como axioma principal de la relación económica conyugal, la igualdad de acceso de los cónyuges al patrimonio común.

No podemos estar de acuerdo con la posición esbozada en la opinión mayoritaria de que al reconocer crédito al cónyuge no titular por *todo* lo que éste hizo para que el otro lograra obtener el título profesional de doctor en medicina con especialidad y subespecialidad, "abriría las puertas, en los pleitos de divorcio, a contabilizar cada acto espontáneo

que sea producto de la dinámica de la relación conyugal". Opinión mayoritaria, pág. 974. Mucho menos podemos, bajo las circunstancias específicas de este caso, refrendar la aseveración de que los *"sacrificios, esfuerzos, apoyo moral y cualquier otra ayuda brindada a su marido es lo que se espera de los cónyuges"*. (Énfasis suplido.) Íd., pág. 974. Nos parece que esta posición resulta acomodaticia, que no toma en consideración las realidades de la vida familiar actual.

Resulta, además, incompatible que de una parte la mayoría de este Tribunal afirme que la peticionaria no es acreedora a una compensación por sus sacrificios como parte de la liquidación de bienes gananciales por estar reñido con el citado artículo 89 y que, de otra parte, se reconozcan estos "sacrificios" para la fijación de una pensión post divorcio. No existe una justificación posible para esta dicotomía contradictoria. La mayoría sostiene que a la peticionaria no se le pueden reconocer sus reclamos para concederle un crédito contra la comunidad de bienes, pero sí pueden reconocerle estos mismos reclamos para concederle una pensión alimentaria de ex cónyuge. Tomar en consideración estos factores únicamente al momento de fijar una pensión post divorcio no resuelve la difícil problemática que usualmente confrontan las mujeres en situaciones análogas, ni la controversia presentada ante nuestra consideración. Sabido es que la concesión y cuantía de esta pensión queda sujeta a la discreción del tribunal y sólo procede cuando se prueba una necesidad económica. Además, la pensión podría variarse e incluso eliminarse al cambiar las circunstancias vigentes al momento de fijarse ésta, en cuyo caso le estaríamos negando a la peticionaria una compensación que, sostenemos, le pertenece por derecho propio, no por necesidad económica circunstancial.

La participación de un cónyuge en la comunidad de bienes, resultante de la disolución del matrimonio, comparte

características fundamentalmente diferentes e independientes del derecho de ese cónyuge a una pensión alimentaria post divorcio. Se trata de dos (2) derechos de los que podría beneficiarse un cónyuge simultáneamente, por lo que la posible concesión de uno de estos derechos no puede impedir que se pueda reclamar el otro. Más aún, no puede impedir que se tomen en consideración los mismos factores para la concesión de ambos derechos.

Este tipo de razonamiento, al provenir precisamente de nuestro más alto Tribunal, es el que ayuda a perpetuar la posición de inferioridad de la mujer ante el varón en la relación conyugal. Esta posición, en la mayor parte de los casos, al disolverse el matrimonio, condena a la mujer y a sus hijos a un nivel de vida muy por debajo, no sólo del que estaban acostumbrados, sino también del que disfrutará su ex esposo. La mujer tendrá que enfrentarse a un mercado de empleo para el cual no está preparada o por lo menos no está tan preparada como su ex cónyuge. De la pareja, de ordinario, será la mujer la que sufrirá el impacto económico adverso más severo, la que verá frustradas sus expectativas. Las realidades socioeconómicas de las sociedades conyugales contemporáneas nos llevan a concluir que los sacrificios de que habla la opinión serán, en la mayor parte de los casos, sólo por parte de la mujer, al varón le tocarán los beneficios.

Si este Tribunal no adopta posiciones de vanguardia y reconoce que, ante las realidades que hoy vivimos, los preceptos que antes nos servían bien necesitan ser revisados, estará marcando un paso de retroceso en la batalla que como pueblo comenzamos a librar en 1952 en favor de la igualdad de los seres humanos. En la Constitución específicamente declaramos que la dignidad del ser humano es inviolable y prohibimos el discrimen "por motivo de raza, *sexo*, nacimiento, origen o condición social, ideas políticas o

religiosas". (Énfasis suplido.) Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 257.

Nos parece increíble que se condene a uno sólo de los cónyuges —usualmente a la mujer— a realizar sacrificios para que el otro cónyuge —usualmente el varón— obtenga un bien privativo de gran valor, el cual, al disolverse el vínculo matrimonial, lo ayudará a realizar sus expectativas económicas y con toda probabilidad le proporcionará un mejor nivel de vida, mientras que al otro cónyuge, al no titular, a la mujer, le sucede todo lo contrario. No podemos estar de acuerdo con una interpretación del Art. 89 del Código Civil, *supra*, que arroje como resultado tal inequidad. No resuelve esta inequidad la expectativa de poder en el futuro obtener una pensión alimentaria que lo que hace es perpetuar el concepto de dependencia que tanto afecta la autoestima de una mujer y fomenta la visión paternalista que tiene el hombre con respecto a ésta. Además, como cuestión práctica, la condena a permanecer atada a un fracaso: el divorcio. La posición que hoy adopta una mayoría de este Tribunal no constituye el balance más justo y razonable de los intereses que entran en juego.

En el caso de autos, los sacrificios y las aportaciones de la cónyuge no titular fueron para que su cónyuge pudiese obtener un bien estrictamente privativo con la esperanza o expectativa de que ese bien privativo fuese utilizado eventualmente para mejorar la situación económica de la familia, de la sociedad de bienes gananciales. Este esfuerzo para permitir la obtención de un bien privativo, o sea, un beneficio que pertenece a uno sólo de los cónyuges, no es a lo que se refiere el Art. 89, *supra*.

Ahora bien, en el caso de autos, nos confrontamos con una situación de naturaleza mixta. En primer lugar, tenemos la obtención de un bien que por su naturaleza privativa pertenecerá a uno sólo de los cónyuges y, en segundo lugar, los beneficios que de ese bien se puedan eventual-

mente derivar, los cuales, mientras subsista el matrimonio, serán gananciales.

En cuanto a lo primero, al disolverse la sociedad de bienes gananciales, al cónyuge no titular se le debe compensar por todas las aportaciones directas e indirectas, o sea, se debe valorar y cuantificar el relevo de deberes que realizó la cónyuge no titular para que su cónyuge pudiese obtener el bien privativo que le proporcionará el disfrute de un mejor nivel de vida al disolverse el matrimonio. Esta valoración no le debe resultar difícil a los tribunales que ya están acostumbrados a realizar cómputos similares en casos de alimentos de menores. En estos casos, al momento de distribuir la carga económica para el sostenimiento de los hijos, se le reconoce a la madre como custodio un valor pecuniario por los cuidos y la atención que le brinda a sus hijos. *Mundo v. Cervoni*, 115 D.P.R. 422 (1984); Fraticelli Torres, *supra*, págs. 494–495. Al respecto, en el escolio 5 del caso de *Domínguez Maldonado v. E.L.A.*, 137 D.P.R. 954 (1995), expresamos que aunque las tareas del hogar no son valoradas en términos monetarios, no podemos ignorar que dichas tareas y servicios son vitales para la salud del régimen económico de un matrimonio y que deben ser tomadas en cuenta al hacer decisiones sobre la división y distribución de bienes de un matrimonio. *Cf. Mundo v. Cervoni,* supra.

En cuanto a lo segundo, los beneficios que del bien privativo se puedan derivar, encontramos que en el caso de autos, antes de que se disolviera el matrimonio, el demandado, doctor Alcalá, comenzó a practicar privadamente la medicina. Para el establecimiento de esta práctica lo ayudó su entonces esposa, doña Rosa Adelina. Ésta, entre otras cosas, le gestionó los servicios de los proveedores de los diferentes planes médicos, la consultoría y los privilegios de hospital. Además, lo ayudó a facturar a los planes médicos, a redactar cartas y a coordinar citas. Aunque la prác-

tica del doctor Alcalá estaba en sus comienzos cuando sobrevino el rompimiento de la relación cónyugal, aquélla, como cualquier negocio en marcha, tiene un valor que va más allá de los bienes muebles e inmuebles tangibles que la componen. La práctica privada de la medicina, como negocio profesional, incluye, además de los objetos materiales, valores intangibles que también son susceptibles de ser valorizados y cuantificados y deben ser objeto de división al liquidarse la sociedad de bienes gananciales. Entre estos bienes se encuentran la lista de pacientes, los sistemas operacionales de la oficina, su potencial, su localización y el *good will* que haya generado, entre otros. Esta práctica privada de la medicina del doctor Alcalá es un bien ganancial que debe ser valorado y dividido entre los cónyuges.

## V

Para alcanzar o acercarnos al objetivo de la igualdad ante la ley que es un postulado constitucional de primordial importancia, es necesario que en situaciones como la de autos haya un cambio de actitudes. Los tribunales tienen la obligación de reconocer la realidad actual y adoptar interpretaciones legales que tomen en consideración la nueva relación existente entre los integrantes de las sociedades conyugales modernas. Debemos rechazar una visión del derecho que meramente refleja y mantiene estructuras sociales que no responden a esa realidad, impidiendo con ello el reconocimiento paulatino de los cambios sociales dirigidos hacia la consecución del objetivo de la igualdad de la mujer en la sociedad.

Hago un especial llamado a la Rama Legislativa para que con el beneficio del insumo de diversos sectores y grupos sociales, que en su día podrían enriquecer la búsqueda de mejores alternativas para remediar situaciones como la

que hoy confrontamos, examine la posible reestructuración de normas legales que hagan justicia a todas las partes, sin trastocar la política pública fundamental de protección a la familia y a los niños, en particular. Las nuevas leyes deben, sin embargo, enfrentar valientemente los cambios socioeconómicos de la estructura familiar no tradicional.[3]

En conclusión, sostengo que la fórmula más justa y equitativa, y hasta que otra cosa no se disponga mediante legislación, sería reconocerle al cónyuge no titular de la carrera o título profesional, los créditos que a continuación enumeramos:

1. Todas aquellas aportaciones económicas directas.

2. Todas aquellas aportaciones indirectas o relevo de deberes previamente señalados.

3. Una participación económica en la práctica de la carrera o profesión de su cónyuge, valorizada ésta al momento de la disolución de la sociedad de bienes gananciales.

Por los fundamentos antes expuestos, disiento de la opinión hoy suscrita por la mayoría de este Tribunal.

---

[3] En su extenso y bien documentado artículo, la profesora Fraticelli Torres discute y analiza varias alternativas. M. Fraticelli Torres, *Un nuevo acercamiento a los regímenes económicos en el matrimonio: la sociedad legal de gananciales en el Derecho puertorriqueño*, 29 (Núm. 2) Rev. Jur. U.I.A. 413 (1995).