JOSÉ CRUZ AYALA, demandante y recurrido, *v.* YOLANDA RIVERA PÉREZ, demandada y recurrente.

*Número:* RE-94-175      *Resuelto:* 11 de junio de 1996

*Luis R. Cuebas Irizarry*, abogado de la recurrente; *E. Alcaraz Casablanca*, abogado del recurrido.

— O —

Opinión concurrente emitida por la Juez Asociada Señora Naveira de Rodón, a la cual se une el Juez Asociado Señor Corrada Del Río.

I

El 22 de julio de 1982, el Sr. José Cruz Ayala y la Sra. Yolanda Rivera Pérez otorgaron una escritura de capitulaciones matrimoniales ante el Lcdo. Manuel Cruz Soto. Mediante dicha escritura, las partes expresamente acordaron que mantendrían separada la propiedad y administración de sus bienes presentes y futuros, descartando el régimen económico de sociedad de bienes gananciales, y que el señor Cruz Ayala sería responsable de pagar los gastos, las rentas y el mantenimiento del hogar conyugal. No se especificaron los bienes respectivos de los otorgantes.

Dos (2) días después, el 24 de julio de 1982, el señor Cruz Ayala y la señora Rivera Pérez contrajeron matrimonio. Ocho (8) años más tarde, el 29 de junio de 1990, el matrimonio quedó disuelto. En la sentencia de divorcio, fundamentándose en la estipulación de las partes, se determinó que el señor Cruz Ayala pagaría a la señora Rivera Pérez doscientos dólares ($200) mensuales en concepto de alimentos; que continuaría pagando la hipoteca así como el mantenimiento de un apartamento adquirido entre ambos, ubicado en el Condominio Solimar en Mayagüez, y que la señora Rivera Pérez continuaría utilizando un vehículo marca Honda, modelo de 1985.

El 16 de agosto de 1990, el señor Cruz Ayala presentó una demanda sobre división de comunidad, en la que alegó que las partes habían adquirido en común proindiviso un apartamento en el Condominio Solimar, ubicado en la ciudad de Mayagüez, y que procedía la división de dicha comunidad. La señora Rivera Pérez contestó la demanda y

presentó una reconvención. En síntesis, la señora Rivera Pérez alegó que existía una sociedad de bienes gananciales entre ella y el señor Cruz Ayala; que el apartamento en cuestión pertenecía a dicha sociedad, y que la escritura de capitulaciones era nula por haberse otorgado un mes después de su boda con el señor Cruz Ayala.

Sus alegaciones sobre la existencia de una sociedad de gananciales se fundamentaron en que, como matrimonio, ella y el señor Díaz Ayala habían otorgado diversas escrituras y/o documentos privados para comprar propiedades y obligarse frente a los acreedores.

En la vista, en los méritos del caso, presentó una escritura sobre compraventa en la cual ella y el señor Cruz Ayala aparecen como compradores de un terreno en el barrio Sábalos de Mayagüez. En esta escritura el notario aclara que el comprador es Manantiales Supermarket, Inc., representada por José Cruz Ayala y no por los esposos Cruz Ayala y Rivera Pérez. También, presentó un contrato de prenda y garantía continua con el Banco de Ahorro F.S.B. en el que aparecen como deudores Manantiales Supermarket, Inc., José Cruz Ayala y Yolanda Rivera Pérez, y una escritura de compraventa de un apartamento en el Condominio Solimar, ubicado en Mayagüez, en el que aparecen como compradores los litigantes Cruz Ayala y Rivera Pérez. Por último, afirmó que había trabajado arduamente como vicepresidenta de la corporación Manantiales Supermarket, Inc. y presentó una carta redactada por el señor Ayala en la cual éste le pide que se quede con el apartamento en el Condominio Solimar, así como con el auto Honda que ella utilizaba.[1]

Posteriormente, la señora Rivera Pérez solicitó que se incluyera como parte en el pleito a Manantiales Supermarket, Inc. para alegar que dicha corporación era el álter ego

---

[1] Por no estar ante nuestra consideración en estos momentos, no entraremos a discutir qué efecto, si alguno, tiene esta carta sobre la interpretación del alcance de las estipulaciones que se hicieran en el caso de divorcio.

del señor Cruz Ayala, a lo cual el tribunal de instancia accedió.

Tras la vista en los méritos del caso, el tribunal de instancia determinó que la escritura de capitulaciones matrimoniales era válida.[2] También determinó que la señora Rivera Pérez no aportó dinero alguno para la adquisición de las propiedades de la pareja y que el documento mediante el cual el señor Díaz Ayala "donó" a la señora Rivera Pérez un apartamento y un vehículo era nulo en derecho por no cumplir con los requisitos mínimos que establece el Art. 575 del Código Civil, 31 L.P.R.A. sec. 2010, o el Art. 574 del Código Civil, 31 L.P.R.A. sec. 2009.

En cuanto al apartamento en el Condominio Solimar en Mayagüez, el tribunal de primera instancia determinó que se creó una comunidad de bienes. Sin embargo, resolvió que habiendo la demandada, señora Rivera Pérez, admitido que ella no aportó nada para su adquisición, la propiedad le pertenecía al señor Cruz Ayala.

Inconforme con lo resuelto, y tras ser denegada una moción de reconsideración, la señora Rivera Pérez recurrió ante nos para señalar los errores siguientes:

1. Erró el Tribunal a quo al resolver que el caso *Umpierre vs. Torres Díaz*, 114 D.P.R. 449, no aplica al caso de autos.
2. Erró el Tribunal a quo al resolver que la demandada-recurrente "nunca aportó nada, pues según su propio testimonio, no poseía bienes de ninguna índole".

En esencia, la peticionaria, señora Rivera Pérez, plantea que el caso *Umpierre v. Torres Díaz*, 114 D.P.R. 449 (1983), aplica al de autos porque establece que puede existir una sociedad de bienes gananciales aunque las partes

---

[2] Durante la vista del caso, se presentó la Escritura Núm. 25 sobre Capitulaciones Matrimoniales, otorgada el 22 de julio de 1982, y la Certificación de este Tribunal que acreditaba que el notario autorizante había notificado dicha escritura en el índice notarial el 26 de julio de 1982. No se presentó prueba alguna de que la escritura sobre capitulaciones matrimoniales se otorgó en una fecha posterior al matrimonio. Por lo tanto, como correctamente determinó el tribunal de instancia, la escritura es válida y rige la relación entre las partes.

hayan otorgado una escritura de capitulaciones matrimoniales y que dicho caso le da valor monetario al concepto de trabajo y de esfuerzo personal de los cónyuges. Alega que la existencia de capitulaciones no excluye la existencia de un régimen legal de gananciales.

Citando el caso *Silva v. Comisión Industrial*, 91 D.P.R. 891, 897–904 (1965), alega que el trabajo realizado por ella en el negocio del señor Cruz Ayala tiene que ser tomado en consideración, ya que decir lo contrario representaría un enriquecimiento injusto.

La sentencia que hoy emite la mayoría del Tribunal revoca el dictamen emitido por el foro de instancia y devuelve el caso a dicho foro para que celebre una vista y determine el alcance de las estipulaciones y el valor de las aportaciones de la señora Rivera Pérez en la adquisición de los bienes de la comunidad. Concurrimos con dicho curso decisorio por los fundamentos que exponemos a continuación.

## II

Nuestro ordenamiento permite otorgar las capitulaciones matrimoniales antes de que una pareja proceda a contraer nupcias, al disponer que en el contrato sobre bienes en ocasión del matrimonio se pueden estipular las condiciones de la sociedad conyugal sobre los bienes presentes y futuros, sin otras limitaciones que las señaladas por la ley. Art. 1267 del Código Civil, 31 L.P.R.A. sec. 3551.

Por supuesto, en los contratos de capitulaciones matrimoniales no se puede pactar nada que sea contrario a las leyes o a las buenas costumbres, ni depresivo de la autoridad que respectivamente corresponde en familia a los futuros cónyuges. Art. 1268 del Código Civil, 31 L.P.R.A. sec. 3552; *Domínguez Maldonado v. E.L.A.*, 137 D.P.R. 954 (1995); *Ab Intestato Saldaña Candelario*, 126 D.P.R. 640 (1990); *Umpierre v. Torres Díaz*, supra.

Citando a Castán Tobeñas, en *Domínguez Maldonado v. E.L.A.*, supra, indicamos que mediante el contrato de capitulaciones matrimoniales se puede regular los derechos de los esposos sobre sus bienes respectivos; los derechos sobre las ganancias realizadas por ellos durante el matrimonio; los intereses de los hijos y de la familia; los intereses de los terceros que contratan con uno u otros de los esposos, y, en definitiva, el interés económico y social de la relación del matrimonio. J. Castán Tobeñas, *Derecho Civil español, común y foral*, 11ma ed., Madrid, Ed. Reus, 1987, T. V, Vol. 1, págs. 308–309.

Bajo la libertad de pacto provista por el Código Civil, en el contrato de capitulaciones matrimoniales una pareja puede optar por: (1) la separación de bienes pero con participación en las ganancias; (2) la sociedad de gananciales, para lo cual basta con guardar silencio y no estipular nada o estipularlo expresamente; (3) el renunciar al régimen legal de gananciales; (4) la total separación de bienes, o (5) el elegir cualquier otro régimen que combine estas posibilidades, siempre que no infrinja las leyes, la moral o las buenas costumbres. *Domínguez Maldonado v. E.L.A.*, supra, pág. 964.

En Puerto Rico, contrario a las nuevas tendencias en las jurisdicciones civilistas, rige la doctrina de la inmutabilidad de las capitulaciones matrimoniales. Cualquier alteración que se haga en las capitulaciones matrimoniales tiene que realizarse antes de celebrarse el matrimonio y con la asistencia y el concurso de las personas que intervinieron como otorgantes. Se prohíbe expresamente que se modifiquen las capitulaciones luego de haberse celebrado el matrimonio. Arts. 1271 y 1272 del Código Civil, 31 L.P.R.A. secs. 3555 y 3556. De hecho, hemos afirmado que para abolir el principio de inmutabilidad se requiere la acción legislativa. *Domínguez Maldonado v. E.L.A.*, supra, pág. 964; *Umpierre v. Torres Díaz*, supra, pág. 459.

En *Domínguez Maldonado v. E.L.A.*, supra, aclaramos que cuando una pareja otorga un contrato sobre bienes en ocasión del matrimonio y expresamente pacta que no se desea crear un régimen ganancial, el hecho de que posterior al matrimonio lleven a cabo actos de administración y esfuerzo común no da vida a una sociedad de bienes gananciales. Otra cosa es si, como en *Umpierre v. Torres Díaz*, supra, en el contrato no se pacta el régimen económico que los interesados desean y, además, se prueba que la pareja usó y administró los bienes como si su matrimonio estuviese regido por una sociedad de gananciales en la que ambos aportaban esfuerzo y trabajo personal. Dicho esto, es obligada la conclusión de que el tribunal de instancia tuvo razón al resolver que *Umpierre v. Torres Díaz*, supra, no aplica al caso de autos.

El señor Cruz Ayala y la señora Rivera Pérez fueron claros en sus expresiones de que no existiría la sociedad económica de gananciales durante su matrimonio y que deseaban mantener la propiedad y administración de todos sus respectivos bienes presentes y futuros. Por el contrario, en *Umpierre v. Torres Díaz*, supra, pág. 459, las partes capitularon para identificar los bienes privativos que cada uno aportaba al matrimonio, " 'para que al liquidarse la sociedad conyugal le sea reconocido y satisfecho' ". Además, reconocieron la potestad de cada cónyuge de administrar sus propios bienes. No escogieron un régimen económico que dispusiera de los bienes futuros. Después de casarse, hicieron uso de los bienes y los administraron como si pertenecieran al caudal común, aportando trabajo y esfuerzo personal.

Distinto al caso de autos, en *Umpierre v. Torres Díaz*, supra, los cónyuges no se obligaron a mantener una separación absoluta de sus bienes y de los frutos de éstos. No descartaron la sociedad de gananciales y, por ello, los actos

de los cónyuges hicieron que ésta surgiera. *Domínguez Maldonado v. E.L.A.*, supra, pág. 966.

## III

Fundamentándonos en los principios de justicia y equidad, en *Domínguez Maldonado v. E.L.A.*, supra, pág. 967, dijimos que no es justo ni lógico que, siendo la institución del matrimonio una favorecida por nuestro ordenamiento, no le ofrezcamos a la esposa que ha otorgado capitulaciones matrimoniales, pero que aporta trabajo y esfuerzo, la misma protección que a la concubina con respecto a los bienes adquiridos en el caso de una comunidad de bienes.

El interés propietario de los concubinos con respecto a los bienes adquiridos o que hayan incrementado de valor vigente la relación, ha sido reconocido en nuestra jurisdicción. *Domínguez Maldonado v. E.L.A.*, supra, pág. 967; *Ortiz de Jesús v. Vázquez Cotto*, 119 D.P.R. 547 (1987); *Caraballo Ramírez v. Acosta*, 104 D.P.R. 474, 481 (1975); *Cruz v. Sucn. Landrau Díaz*, 97 D.P.R. 578, 585 (1969). Dicho interés propietario puede surgir como pacto expreso; como pacto implícito que se desprende espontáneamente de la relación humana y económica existente entre las partes durante el concubinato, y como un acto justiciero para evitar el enriquecimiento injusto. Íd.

El interés propietario se tiene que probar. *Caraballo Ramírez v. Acosta*, supra, pág. 481. No basta una mera alegación de que existe una comunidad de bienes. Se tiene que demostrar que, a pesar de no existir una sociedad de bienes gananciales, se trabajó y se brindaron servicios y esfuerzos para acrecentar el capital privativo de su cónyuge. *Domínguez Maldonado v. E.L.A.*, supra, pág. 968. En fin, ante una situación de desbalance, "un tribunal no puede desatender los reclamos de una mujer envuelta en el quehacer económico de su cónyuge, con la salvedad de que

dichos reclamos sean probados". *Domínguez Maldonado v. E.L.A.*, supra, pág. 970.

## IV

En el caso de autos, la señora Rivera Pérez admitió que no aportó dinero para la adquisición de las propiedades del supermercado o del apartamento ubicado en el Condominio Solimar en Mayagüez. No obstante, quedó establecido que durante los ocho (8) años que duró el matrimonio entre el señor Cruz Ayala y la señora Rivera Pérez, esta última no sólo desempeñó las labores propias de un ama de casa, sino que también laboró arduamente en el negocio de su esposo, Manantiales Supermarket, Inc. Ocupaba la posición de vicepresidenta de la corporación; estaba autorizada para girar cheques de la cuenta corriente del negocio e incluso comprometió su crédito mediante un contrato de prenda y garantía continua para beneficio del negocio y como cocompradora del apartamento.[3]

Aun así, el tribunal de instancia determinó que la señora Rivera Pérez "no aportó nada", pues no poseía bienes de índole alguna. No tomó en cuenta, pues, el valor de los servicios realizados por la esposa, o sea, su contribución laboral en el negocio, las tareas realizadas en el hogar y la aportación de su crédito en los negocios financieros

---

[3] Aunque los bienes dados en prenda consistieron de un pagaré hipotecario suscrito por Manantiales Supermarket, Inc., representado por su presidente señor Cruz Ayala, y aunque dicho préstamo haya sido pagado sin que la demandada aportara dinero de su propio peculio, no es menos cierto que en el contrato de prenda y garantía ella aparece firmando como codeudora, comprometiendo así su crédito.

En nuestra sociedad moderna el buen crédito resulta indispensable, especialmente en el mundo de los negocios. Para llevar a cabo las actividades propias de la actividad comercial es necesario tenerlo. De hecho, el comercio y la industria no se conciben sin la especulación, ya que desde el punto personal no es otra cosa que la confianza que el empresario inspire de que cumplirá sus compromisos. El crédito es, pues, la capacidad para obtener un préstamo de dinero u otros objetos bajo la promesa de devolverlos dentro de cierto tiempo; crea un vínculo jurídico entre el acreedor y el deudor. R. Martínez Mendoza, *La Quiebra y Usted*, San Juan, Ed. Equity, 1985, pág. 5.

realizados. Redujo a cero la participación de la señora Rivera Pérez en los años que estuvo casada. Erró el tribunal de instancia al así hacerlo.

La señora Rivera Pérez abandonó su trabajo como asistente dental tras contraer matrimonio con el señor Cruz Ayala, para dedicarse a las tareas del hogar formado con su entonces esposo y participar activamente en el quehacer económico de éste. Si bien es cierto que no aportó bienes tangibles, muebles o inmuebles, sí aportó su crédito y trabajo. Luchó, tanto en el hogar como en el negocio en sí, para lograr el progreso económico de la comunidad de bienes, como en efecto pasó. Contribuyó, pues, con su esfuerzo y crédito para lograr los bienes materiales que hoy son objeto de esta acción de división de comunidad. Recientemente en nuestra opinión disidente en el caso *Díaz v. Alcalá*, 140 D.P.R. 959, 998 (1996), dispusimos que: "[a]l respecto, en el escolio 5 del caso de *Domínguez Maldonado v. E.L.A.*, 137 D.P.R. 954 (1995), expresamos que aunque las tareas del hogar no son valoradas en términos monetarios, no podemos ignorar que dichas tareas y servicios son vitales para la salud del régimen económico de un matrimonio y que deben ser tomadas en cuenta al hacer decisiones sobre la división y distribución de bienes de un matrimonio. Cf. *Mundo v. Cervoni*, [115 D.P.R. 422 (1984)]". El no hacerlo tiene como efecto la perpetuación de prejuicios y perjuicios, ya que no se valora la labor históricamente realizada por las mujeres desde sus hogares y se desprecia el valor real que representa esta gestión desde el punto de vista económico y social. *Informe sobre el Discrimen por Razón de Género en los Tribunales de Puerto Rico*, San Juan, Tribunal Supremo de Puerto Rico, Comisión Judicial Especial para Investigar el Discrimen por Género en los Tribunales de Puerto Rico, 1995, pág. 177.

En equidad y en justicia, para evitar un enriquecimiento injusto a expensas del trabajo de la demandada recurrente, ésta tiene derecho a una parte de esos bienes

en proporción a su aportación. *Caraballo Ramírez v. Acosta*, supra, pág. 485.

En cuanto al apartamento que ambos adquirieron, no hay duda de que existió una comunidad de bienes. De hecho, mediante la demanda presentada por el propio señor Cruz Ayala éste lo acepta y solicita la división de dicha comunidad. Pero el tribunal de instancia, al ordenar la división de la comunidad no sólo no tomó en consideración el alcance de la estipulación que hicieran las partes en el caso de divorcio, sino que entendió que como la señora Rivera Pérez no aportó dinero para la adquisición del apartamento, que era el hogar de los entonces cónyuges, la propiedad le pertenecía única y exclusivamente al demandante, señor Cruz Ayala.

No es ni justo ni correcto menospreciar la aportación crediticia, física y anímica al sustento del hogar conyugal de la señora Rivera Pérez que propiciaron y permitieron la adquisición de bienes materiales. Al momento de liquidar una comunidad de bienes hay que darles valor. No puede dársele crédito sólo al ex marido fundamentándose en el hecho de que la esposa no contribuyó proporcionalmente con dinero y haciendo caso omiso de las aportaciones antes mencionadas. *Cf. Mundo v. Cervoni*, 115 D.P.R. 422 (1984). Aunque el señor Cruz Ayala alega que él pagaba los gastos de la casa, de la luz y el agua, y los gastos del vehículo, y que, además, le daba una cantidad de dinero semanal a la señora Rivera Pérez, ésto no anula los esfuerzos y las aportaciones hechas por su entonces esposa que contribuyeron a la adquisición de los bienes de la comunidad. No podemos olvidar que unas capitulaciones matrimoniales que descartan el régimen económico de la sociedad de bienes gananciales, no invalidan el mandato del Código Civil de que los cónyuges deben protegerse y satisfacer sus necesidades mutuamente en proporción a sus respectivas condiciones y medios de fortuna. Arts. 68 y 89 del Código Civil, 31 L.P.R.A. secs. 221 y 282.

En atención a los fundamentos antes descritos, procederíamos a dictar sentencia que revoque la emitida por el foro de instancia y devuelva el caso para que el tribunal celebre una vista y determine el alcance de las estipulaciones habidas en el caso de divorcio y el valor de las aportaciones de la señora Rivera Pérez en la adquisición de los bienes de la comunidad, luego de lo cual, realizaría la división de los bienes que proceda.

— O —

Opinión concurrente emitida por el Juez Asociado Señor Fuster Berlingeri, a la cual se une el Juez Presidente Señor Andréu García.

En el caso de autos procede dictar sentencia para revocar la de instancia y devolverla a dicho foro para procedimientos ulteriores. Ello por las razones que se exponen más adelante. Veamos.

I

Como se sabe, las capitulaciones matrimoniales no son el régimen ordinario para atender los aspectos económicos de la unión entre dos cónyuges. Sólo deben pactarse tales capitulaciones con plena conciencia de lo que ello acarrea; porque una vez pactadas, sus términos son vinculantes, conforme a la voluntad originaria de las partes.

Tanto Puig Brutau como Lacruz Berdejo han señalado que los cónyuges, al acordar las capitulaciones matrimoniales, pueden en su propio interés fijar autolimitaciones en cuanto a su situación económica dentro del matrimonio. "Es decir, los cónyuges pueden disponer para su propia conveniencia reglas que amplíen los poderes jurídicos de uno de ellos, cualquiera que sea, a costa de los del otro". (Escolio omitido.) J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1985, T. IV, pág. 115.

Véase J.L. Lacruz Berdejo, *Elementos de Derecho Civil*, Barcelona, Ed. Bosch, 1982, T. IV, pág. 328. Ello es parte de la naturaleza intrínseca del contrato de capitulaciones matrimoniales.

Conforme a la aludida naturaleza de las capitulaciones matrimoniales, no cabe que el contrato que las formaliza sea interpretado judicialmente para añadir elementos nuevos o para variar los términos de lo pactado. Dicho contrato no está sujeto a revisiones judiciales que en efecto alteren la voluntad originaria de las partes. Es por ello que no tiene mérito alguno el planteamiento que nos hace la peticionaria Rivera Pérez, de que resolvamos que en su caso las capitulaciones pactadas no excluyen la existencia de un régimen legal de gananciales. Aquí los futuros cónyuges habían pactado clara y expresamente que en su matrimonio se mantendrían separadas la propiedad y la administración de sus bienes presentes y futuros, y que se descartaba el régimen económico de la sociedad de bienes gananciales. No podemos alterar ese claro acuerdo. No están presentes en este caso las circunstancias *excepcionales* que dieron lugar a nuestros pronunciamientos muy particulares en *Umpierre v. Torres Díaz*, 114 D.P.R. 449 (1983), y en *Domínguez Maldonado v. E.L.A.*, 137 D.P.R. 954 (1995). Acceder al planteamiento de la peticionaria significaría hacer otra modificación más al ordenamiento jurídico sobre las capitulaciones matrimoniales, que bastante enrevesado está ya, en virtud de nuestras decisiones en *Domínguez Maldonado v. E.L.A.*, supra, y en *Umpierre v. Torres Díaz*, supra. Una ampliación o extensión de lo pronunciado en esas dos decisiones no sólo desnaturalizaría la figura jurídica del contrato de capitulaciones matrimoniales, sino que, además, sería totalmente innecesario, ya que el caso de autos puede resolverse de una manera más sencilla.

En efecto, el tribunal de instancia erró al dictar sentencia como lo hizo en el caso de autos. Por razones que son independientes del planteamiento sobre la existencia aquí

de una sociedad de gananciales, no procedía que dicho foro determinase que la propiedad en disputa le pertenecía únicamente al señor Cruz Ayala, sin dilucidar más a fondo los derechos que la señora Rivera Pérez pudiese tener con respecto a la propiedad en cuestión.

Para disponer del caso conforme a derecho, el tribunal a quo debió haber determinado el alcance de las *estipulaciones* sobre la propiedad aludida, *acordadas por las partes al quedar disuelto su matrimonio*. Podría ser que la intención de las partes con respecto a dicha propiedad *al momento del divorcio* haya sido de tal trascendencia, que haya ocurrido una transacción determinativa de la controversia. Véanse: *Sucn. Román v. Shelga Corp.*, 111 D.P.R. 782 (1981); *P.R. Glass Corp. v. Tribunal Superior*, 103 D.P.R. 223 (1975). Esto por sí solo justifica revocar el dictamen de instancia y devolver el caso a foro a quo para que celebre una vista y determine el alcance de las estipulaciones acordadas por las partes al divorciarse.

El tribunal de instancia, además, tenía que dilucidar y esclarecer el alcance de lo dispuesto en la escritura de compraventa de la propiedad en cuestión, en la cual tanto el señor Cruz Ayala como la señora Rivera Pérez comparecieron como *compradores* de ésta. Aunque la señora Rivera Pérez admitió que no aportó dinero para la adquisición de la propiedad en cuestión, es posible que, por común acuerdo, su aportación haya sido mediante los trabajos realizados por ella en el negocio de su esposo. Ciertamente la prestación de una parte en una empresa común puede ser laboral. No tiene que ser necesariamente pecunaria. Nótese que en su demanda sobre división de comunidad, Cruz Ayala expresamente admite que las partes adquirieron la propiedad en cuestión como *condómines* y que existía una comunidad de bienes entre ellos con respecto a ésta. En efecto, en su acción Cruz Ayala sólo reclamaba la *mitad* del valor neto de la propiedad, más una acreencia correspondiente a determinados pagos relativos a la pro-

piedad aludida, hechos por él con dinero privativo. No podía el tribunal dictar una sentencia para resolver que el demandante era el único y exclusivo dueño de la propiedad, cuando ello era contrario incluso a las alegaciones y la reclamación del propio demandante.

Nótese, además, que el acuerdo en las capitulaciones matrimoniales de mantener separada la propiedad y administración de sus bienes futuros no constituye necesariamente un impedimento a la adquisición *en común* de alguna propiedad en particular. Ello sería así si tal adquisición estuviese prohibida en el pacto de capitulaciones matrimoniales. Si no hay tal prohibición, nada le impide a las partes que tienen pleno señorío sobre sus propios bienes, precisamente en el ejercicio de tal señorío, acordar en un caso particular la adquisición de algún bien en común y qué aportaciones haría cada cual a tales fines. El foro a quo debió haber examinado si aquí se formalizó un acuerdo de tal naturaleza antes de denegar el reclamo de la peticionaria.

Por todo lo anterior, debe revocarse la sentencia emitida en este caso por el foro de instancia y devolverlo para dilucidar los dos asuntos mencionados antes.

— O —

Opinión disidente del Juez Asociado Señor Negrón García, a la cual se une el Juez Asociado Señor Hernández Denton.

I

El 22 de julio de 1982, José Cruz Ayala y Yolanda Rivera Pérez otorgaron capitulaciones matrimoniales.[1] En ellas

---

[1] Escritura Núm. 25 ante el notario Manuel Cruz Soto. Se presentó como prueba una certificación acreditativa de que dicho notario incluyó esta escritura en su Informe sobre el Índice Notarial de 26 de julio de 1982. Avalamos la determina-

expresaron su clara intención de "que su matrimonio *no est[uviera]* sujeto [sic] al *régimen de la sociedad legal* de bienes gananciales provista [sic] en el Código Civil de Puerto Rico, ni sus bienes *presentes* o *futuros*". Consignaron, además, su deseo de "*mantener separadamente* la propiedad y administración de todos sus respectivos bienes *presentes y futuros*". (Énfasis suplido.) Apéndice, *Exhibit* I, pág. 1. Dos (2) días después —el 24— contrajeron nupcias.

El 13 de marzo de 1984, los esposos Cruz-Rivera compraron, mediante una escritura pública,([2]) un apartamento en el Condominio Solimar, en Mayagüez. Aunque ambos comparecieron en la escritura, la *totalidad* del pronto y, subsiguientemente, los pagos mensuales de la hipoteca y de las cuotas de mantenimiento fueron satisfechas con el dinero *exclusivo* del señor Cruz Ayala. T.E., págs. 16 y 78.

Años más tarde, el señor Cruz Ayala se marchó del hogar conyugal y le dejó una carta a la señora Rivera Pérez de 1ro de junio de 1988.([3]) En ella le decía: "[v]ete al abogado para diborciarnos [sic]... quédate con el apartamento no lo quiero por favor esto es firme"; también "quédate con el carro nuevo para ti".

El 29 de junio de 1990 quedó disuelto el matrimonio por sentencia final y firme del Tribunal Superior, Sala de Mayagüez. Poco después, el 17 de agosto, el señor Cruz Ayala presentó una demanda sobre división de comunidad de bienes. Alegó, en síntesis, que al no existir una sociedad de gananciales, y habiendo ambos comprado como condómines el apartamento en Mayagüez, existía sobre éste una comunidad.

En su contestación, la señora Rivera Pérez *negó esa contención*. Adujo que el régimen en su matrimonio fue la

---

ción del tribunal de instancia sobre su validez.

([2]) Escritura Núm. 17 sobre compraventa suscrita ante el notario Rigoberto Martínez Cruz. Aparecen como propietarios vendedores el Sr. Ramón E. González Tizol y su esposa, la Sra. Socorro Díaz Ristoruci; como compradores, los esposos Cruz-Rivera.

([3]) *Exhibit* A, ambas partes, quienes estipularon que se redactó en esa fecha.

sociedad legal de gananciales. Solicitó su liquidación conforme a las disposiciones legales referentes al régimen ganancial.(⁴)

En la *vista en sus méritos* se presentó la prueba testifical y documental.(⁵) Oportunamente, el 24 de enero de 1994 el ilustrado tribunal de instancia (Hon. Carlos Q. Ramírez Ríos, Juez) dictó la sentencia y determinó que el apartamento "pertenecía única y exclusivamente al demandante José Cruz Ayala".(⁶) Apéndice, *Exhibit* 11, pág.

---

(⁴) En la sentencia mayoritaria de este Tribunal se descartan arbitrariamente, sin análisis, las determinaciones de hecho del foro de instancia, que están formuladas a base, según veremos, de la credibilidad merecida a los testigos y en un examen integral de toda la prueba documental.

(⁵) Se ignora así la abundante prueba. Se presentó una escritura sobre compraventa, en la cual ambos aparecen como compradores de un terreno en el barrio Sábalos de Mayagüez. En esta escritura el notario *aclara que el comprador lo es Manantiales Supermarket, Inc.*, representada por José Cruz Ayala y *no* por los esposos Cruz Ayala y Rivera Pérez. Se presentó, además, un contrato de prenda y garantía continua con el Banco de Ahorro F.S.B. en el que aparecen como deudores Manantiales Supermarket, Inc., José Cruz Ayala y Yolanda Rivera Pérez.

Aparte de ésta, se presentó la escritura de capitulaciones matrimoniales; una copia de la sentencia de divorcio de José Cruz Ayala y Providencia Rivera Morales, dictada por el Tribunal Superior, Sala de Mayagüez, el 29 de diciembre de 1981; una copia de la sentencia de divorcio del señor Cruz Ayala y la señora Rivera Pérez; una copia de la carta escrita a puño y letra por el señor Cruz Ayala a la señora Rivera Pérez el 2 de junio de 1988, y una copia de una deposición tomada a la señora Rivera Pérez el 16 de enero de 1991, entre otros.

Por el demandante testificó el Lcdo. Manuel Cruz Soto y el señor Cruz Ayala; por la demandada la propia señora Rivera Pérez.

(⁶) El tribunal le adjudicó la totalidad del apartamento al señor Cruz Ayala, aun cuando inicialmente él, en su demanda, alegó que "ha hecho determinados pagos a la hipoteca que grava dicha propiedad por lo que tiene [únicamente] una acreencia sobre el valor de la propiedad más una mitad del valor neto que resulte [de la venta en pública subasta]". Apéndice, *Exhibit* 14, pág. 61.

La determinación del tribunal a quo se sostiene. De la Minuta de 29 de marzo de 1993 surge que el señor Cruz Ayala sometió al tribunal el Informe de Conferencia Preliminar entre abogados, conjuntamente con la prueba documental antes aludida.

De ese informe se desprende que una de las teorías del señor Cruz Ayala era: "[q]ue en cuanto a la propiedad adquirida mediante la Escr. #17 otorgada en Mayagüez, P.R. ante el Notario Rigoberto Martínez Cruz, el 13 de marzo de 1984, debe referirse a un Contador Partidor para que *determine qué participación en la propiedad descrita en dicha escritura tiene cada una de las partes*". (Énfasis suplido.) Además, aparece que una de las controversias sometidas por la parte demandante fue saber qué "participación tiene la demandada en la propiedad descrita en la Escritura #17 del 13 de marzo de 1984, ante el Lcdo. Rigoberto Martínez Cruz".

Subsiguientemente, el 1ro de octubre de 1993, en un escrito presentado ante dicho tribunal titulado Alegato de la Parte Demandante, el señor Cruz Ayala alegó "que en la compra del Condominio se creó expresa o tácitamente una comunidad de

55. Con vista a unas incompatibilidades esenciales insubsanables y admisiones propias, no le merecieron *credibilidad alguna* las alegaciones y el testimonio de la señora Rivera Pérez.([7]) No conforme, acudió ante nos.([8])

## II

No tiene razón la señora Rivera Pérez al invocar *Umpierre v. Torres Díaz*, supra. Las situaciones fácticas son claramente distinguibles. Allí se *otorgaron unas capitulaciones matrimoniales que identificaban los bienes que aportarían al matrimonio*, le asignaron un valor en caso de una disolución y establecieron que cada cónyuge podría disponer de ellos y entrar en negocios sin el consenso del otro. Ahora bien, distinto de los esposos Cruz-Rivera, los Umpierre-Torres *no rechazaron expresamente el régimen de la sociedad de bienes gananciales*.

---

bienes en la cu[a]l la demandada *no aportó cantidad alguna*, por lo que dicho Apartamiento le pertenece *enteramente* al demandante". Además, "que la demandada no tiene derecho a participación alguna en los bienes adquiridos por el demandante, si algunos, durante el matrimonio, por existir las Capitulaciones Matrimoniales".

El 13 de octubre, la demandada señora Rivera Pérez presentó su memorándum. No contradijo esa alegación, pues se limitó a reafirmar su contención sobre la existencia del régimen ganancial y que el apartamento era un bien ganancial.

([7]) Concluyó el tribunal en su sentencia que "atendido el testimonio del Lic. Manuel Cruz Soto, la Certificación del Honorable Tribunal Supremo de Puerto Rico, acreditativa de que se notificó el Indice Notarial conforme a Derecho, *no concede crédito alguno a la declaración* de la demandada Yolanda Rivera Pérez". (Énfasis suplido.) Apéndice, *Exhibit* 11, pág. 52.

Más adelante indicó que "[e]n cuanto a la conte[stación] de la parte demandada en el sentido de que ella había firmado documentos y que fue la intención de las partes "mantener una Sociedad de Gananciales, *no surge de la prueba hecho alguno* que sostenga dicha alegación". (Énfasis suplido.) Íd.

Finalmente sostuvo que "Yolanda [Rivera Pérez], no firmó ni tuvo participación alguna en la compra del solar donde ubica el Supermercado y *su testimonio* en tal sentido en la toma de deposición *resultó totalmente falso*". (Énfasis suplido.) Íd., pág. 53.

([8]) Como señalamientos discute los siguientes:

"1. Erró el Tribunal a quo al resolver que el caso de *Umpierre vs. Torres Díaz*, 114 D.P.R. 449, no aplica al caso de autos.

"2. Erró el Tribunal a quo al resolver que la demandada-recurrente 'nunca aportó nada, pues según su propio testimonio, no poseía bienes de ninguna índole'." Solicitud de revisión, pág. 3.

Ante esos hechos peculiares resolvimos que las actuaciones de los cónyuges Umpierre-Torres, al posteriormente comportarse y hacer negocios como si estuvieran bajo el régimen ganancial, "no constitu[ían] variaciones de las capitulaciones matrimoniales otorgadas por ellos". *Umpierre v. Torres Díaz*, 114 D.P.R. 449, 461 (1983). En consecuencia, reconocimos que habían desarrollado su actividad económica durante el matrimonio bajo el régimen de la sociedad legal de gananciales.

*Esta distinción es crucial y decisiva.* Es suficiente para resolver que el primer señalamiento de error no fue cometido. Para intentar superar este escollo se discute y aplica infructuosamente *Domínguez Maldonado v. E.L.A.*, 137 D.P.R. 954 (1995).

En *Domínguez Maldonado v. E.L.A.*, supra, pág. 957, la opinión mayoritaria expuso que en las capitulaciones matrimoniales las partes acordaron " 'que *no rija la sociedad económica de gananciales* en el matrimonio a celebrarse entre ellos ....' Sin embargo, *no indicaron bajo cuál régimen económico se regirían una vez contraído el matrimonio*". (Énfasis suplido.) Concluyó entonces que, aunque los cónyuges hubieran actuado como si existiera el régimen ganancial, éste no surgió. Lo "contrario sería variar jurisprudencialmente la doctrina de la inmutabilidad de las capitulaciones matrimoniales". Reconocieron que pudo haber existido una comunidad de bienes entre los cónyuges y devolvieron el caso al tribunal de instancia para que determinase sobre su existencia.

Ante ese curso decisorio *disentimos*,[9] por entender que las capitulaciones eran *deficientes*, pues no precisaban las reglas que gobernarían la relación conyugal. *A falta de capitulaciones válidas, debió regir la sociedad de bienes gananciales.*

En el caso ante nos, los novios Cruz-Rivera *inequívocamente rechazaron el régimen ganancial y escogieron el ré-*

---

[9] Se unió, entonces, el Juez Asociado Señor Hernández Denton.

*gimen de separación de bienes.* En recta compatibilidad doctrinal, no aplican *Umpierre v. Torres Díaz,* supra, ni *Domínguez Maldonado v. E.L.A.,* supra.

### III

Aclarado estos extremos, es *evidente* que el matrimonio Cruz-Rivera se rigió por el *régimen de separación de bienes.* Se trata de una *realidad* no susceptible de ser cambiada por una interpretación judicial. El Art. 1327 del Código Civil, 31 L.P.R.A. sec. 3711, visualiza dos (2) maneras de nacer el régimen de separación: por declaración expresa en capitulaciones matrimoniales o por providencia judicial.[10] Aquí *ambos lo pactaron voluntariamente* antes del matrimonio.[11] La filosofía del régimen de separación es que cada cónyuge conserve la propiedad, la administración, el disfrute y la disposición de los bienes que tuviese al momento de *comenzarlo* y los que *después* adquiera *por cualquier título.* M. Albaladejo, *Curso de Derecho Civil,* 6ta ed., Barcelona, Ed. Bosch, 1994, pág. 196; D. Espín Cánovas, *El nuevo derecho de familia español,* Madrid, Ed. Reus, 1982, pág. 185; M. Albaladejo, *Compendio de Derecho Civil,* 3ra ed., Barcelona, Ed. Bosch, 1976, pág. 533. Advertimos, sin embargo, que aunque nuestro código reconoce este régimen económico, nada dispone sobre las reglas que han de seguirse para atender las cargas del matrimonio ni para disponer los bienes o su liquidación. Las partes están en libertad de pactar estas reglas en sus capitulaciones matrimoniales.

---

[10] Dispone que "[a] *falta de declaración expresa* en las capitulaciones matrimoniales, la separación de bienes entre los cónyuges durante el matrimonio no tendrá lugar sino en virtud de *providencia judicial*". (Énfasis suplido.) 31 L.P.R.A. sec. 3711.

[11] Sus características son: (a) se acepta por voluntad de los esposos; (b) éstos pueden establecer con libertad las reglas que estimen oportunas para atender durante el matrimonio el *sostenimiento de sus cargas,* para disponer de sus bienes o para liquidar en su día; (c) ha de pactarse *antes* del matrimonio, y (d) ambos cónyuges están en idénticas circunstancias. J.M. Manresa y Navarro, *Comentarios al Código Civil Español,* 6ta ed., Madrid, Ed. Reus, 1969, T. IX, pág. 988.

Según expusimos, los esposos Cruz-Rivera convinieron expresamente *mantener separados* todos sus bienes presentes —existentes al momento de celebrarse el matrimonio— y los futuros adquiridos durante el matrimonio por cualquier título. Ahora bien, *nada pactaron sobre las normas que se han de seguir* sobre cargas, disposición y liquidación de bienes.

## IV

La vigencia del régimen de separación no excluye que los esposos adquieran un bien en común. Al comparecer los esposos Cruz-Rivera en la escritura de compraventa del apartamento en el Condominio Solimar, constituyeron una *comunidad ordinaria* entre ambos. Como dice Albaladejo, *op. cit*, pág. 196, existe el régimen de separación "[s]i los esposos adquieren conjuntamente algún bien o derecho [que] se entiende que les pertenece, en *principio*, en *proindiviso ordinario*". (Énfasis suplido.) Por su parte, Espín, *op. cit.*, pág. 186, sostiene "que si *no es posible acreditar* a cu[á]l de los cónyuges pertenece algún bien, corresponde a ambos por mitad. *Comunidad ordinaria*, por cuotas, sobre cada bien o derecho que en esta situación se halle y a la que se aplica, por tanto, el régimen general del Código". (Énfasis suplido.)[12]

Vemos, pues, que en cuanto a la liquidación de dicho apartamento, aplica el régimen general del código sobre la comunidad ordinaria de bienes. Establece *que, a falta de prueba* sobre las porciones correspondientes a cada partícipe, se presumirán iguales. Art. 327 del Código Civil, 31

---

[12] M. Albaladejo, en su obra *Compendio de Derecho Civil*, 3ra ed., Barcelona, Ed. Bosch, 1976, pág. 533, sostiene que en el régimen de separación son de cada cónyuge "los [bienes] que le correspondan ... si es que se disuelve un régimen en el que los había comunes. 'Los *bienes cuya propiedad no pueda demostrarse que es exclusiva de uno de los esposos*, habrán de estimarse de copropiedad de ambos ... Pero de *copropiedad ordinaria*, es decir no ganancial (que no existe)' ". (Énfasis suplido.)

L.P.R.A. sec. 1272. *Sin embargo, esa no es la situación de autos.* Evaluada la transcripción de evidencia, la prueba documental y los alegatos de las partes, forzoso es concluir que, a la luz de la doctrina vigente, *la señora Rivera Pérez no tiene participación alguna en la comunidad.*

*Primero*, es un *dato no contradicho* que la *totalidad* del pronto, los pagos mensuales de hipoteca y el mantenimiento *siempre* los hizo de su propio peculio el señor Cruz Ayala. *Nunca hubo aportación pecuniaria alguna de la señora Rivera Pérez.*[13]

A estos efectos nos dice Lacruz Berdejo que "[t]eórica-

---

[13] De su deposición ofrecida en evidencia, transcribimos las porciones pertinentes siguientes:

"P. Nunca ha tenido cuentas de cheques?

"R. *No.*

"P. Nunca ha tenido cuentas bancarias?

"R. *No*, señor.

"P. Nunca ha tenido una cajita en el banco con dinero?

"R. Ah, *no* señor.

"P. Nunca ha tenido dinero en su casa en cantidades grandes?

"R. *No*, señor.

"P. Nunca ... que es lo más que usted podía recordar tuviera en dinero en su casa?

"R. *No*, yo a veces cuando podía hacía un Christmas Club, era todo lo que hacía para en las navidades poder sufragar los gastos de navidad.

"P. Dígame, para 1984, usted tenía algún dinero en caja, tenía algún dinero en cash?

"R. *No*, señor.

"P. No tenía nada?

"R. *Usted dice mío personal.*

"P. Suyo personal?

"R. *No*, señor.

. . . . . . . .

"P. De dónde salieron los quince mil pesos que dice la escritura se pagaron de pronto, *quién los pago?*

"R. Del apartamento.

"P. Si?

"R. Bueno *él lo pago, entre los dos lo compramos.*

"P. Si por eso si pero...

"R. Sí, pero *yo no tenía quince mil pesos.*

"P. Después que ustedes compraron esa propiedad los pagos mensuales quién hizo los hizo de la hipoteca?

"R. Pues *él hacía los pagos mensuales.*

"P. El hacía los pagos mensuales, mantenimiento también lo *pagaba él?*

"R. *Sí, señor.*" (Énfasis suplido.) Apéndice, *Exhibit* 5, págs. 21–24.

mente la circunstancia de que el patrimonio de ambos esposos *esté separado no excluye la adquisición de cosas en común*; prácticamente así se presumirá, por de pronto, en cuanto a los elementos de la economía doméstica y familiar que en común se poseen, y que han sido adquiridos sin especificar quién es el cónyuge que suministra los medios: *para que sean de un cónyuge es preciso probar que fue él quién suministro el dinero"*. (Énfasis suplido.)[14] J.L. Lacruz Berdejo y F. Sancho Rebullida, *Derecho de Familia*, 3ra ed., Barcelona, Ed. Bosch, 1978, Vol. I, pág. 533.

*Segundo*, conforme a la prueba, el trabajo realizado por la señora Rivera Pérez en el negocio del señor Cruz Ayala, sus gestiones y ayudas que como esposa hizo para beneficio de éste, y su colaboración como ama de casa, no pueden considerarse extraordinarias, según las circunstancias fácticas presentes; por ende, no son susceptibles de estimarse o abonarse como participación suya en la comunidad sobre el apartamento.

De entrada, recalcamos que nuestro Código Civil impone, *bajo cualquiera que sea el régimen que rija el matrimonio*, un deber de *mutua ayuda y socorro* entre los cónyuges.[15] Estos conceptos —*mutua ayuda y socorro*— han sido precisados en la doctrina española. Visitémosla.

No se debate que los novios pueden pactar libremente el régimen económico que habrá de regir su matrimonio. Sin embargo, según expone Albaladejo, *op. cit.*, pág. 148, "hay

---

[14] La presunción de igualdad "puede ser injusta, al menos en cuanto a las proporciones, cuando uno de los esposos tiene una fortuna muy superior al otro, y por tanto un excedente de renta que destina a la inversión, sin poder demostrar que ésta haya versado sobre los concretos bienes en torno a los cuales se discute. *Acaso entonces la diferencia de renta se considere por los tribunales como prueba de que las cuotas son distintas"*. (Énfasis suplido.) J.L. Lacruz Berdejo y F. Sancho Rebullida, *Derecho de Familia*, 3ra ed., Barcelona, Ed. Bosch.

[15] El Art. 88 del Código Civil dispone:

"Los cónyuges están obligados a vivir juntos, guardarse fidelidad y *socorrerse mutuamente.*" (Énfasis suplido). 31 L.P.R.A. sec. 281.

Por su parte, el Art. 89 del Código Civil establece:

"Los cónyuges deben *protegerse y satisfacer sus necesidades mutuamente* en proporción a sus respectivas condiciones y medios de fortuna." (Énfasis suplido.) 31 L.P.R.A. sec. 282.

ciertos preceptos legales relativos a las relaciones patrimoniales de los cónyuges *que se aplican sea cualquiera el régimen que las rija"*. Estos preceptos —denominados *régimen matrimonial primario*— no son otro régimen junto al de gananciales, separación o participación, *sino normas de aplicación común en todos los regímenes.* Íd.

Entre otras cosas, el régimen matrimonial primario trata del *levantamiento de las cargas del matrimonio. Cargas del matrimonio* son "los gastos que hagan los cónyuges en común para subvenir a sus necesidades ... [y] cualesquiera otros que, a tenor de su posición, pesen sobre la familia o simplemente sobre las personas que son sus componentes". Albaladejo, *op. cit.*, pág. 148.(16) Éstas "han de soportarse [sic] con ... todos los bienes del matrimonio que sea necesario, se trate de comunes de los esposos o de privativos de uno solo, de forma que mientras haya un bien, aunque sea particular, de alguno de aquellos, deberá ser aplicado a levantar cualquier carga del matrimonio que esté sin atender". Íd., págs. 149–150.

Por lo tanto, las contribuciones que haga un cónyuge para beneficio de ambos o del otro serán consideradas como su aportación a la liberación de las cargas matrimoniales. Ahora bien, reconocemos la realidad de que este deber habitualmente se traduce, *sin menoscabar los principios de igualdad de los sexos y de los cónyuges*, mediante la asistencia que la mujer brinda tradicionalmente, con el cuidado de la familia y el mantenimiento del hogar.

---

(16) Este principio, *ínsito en nuestro Cógido Civil*, en el nuevo Código Civil español establece expresamente, como *cargas del matrimonio*, " '[e]l sostenimiento de la familia, la alimentación y educación de los hijos comunes y las atenciones de previsión acomodadas a los usos y circunstancias de la familia' (art. 1.362, 1.ª, primer párrafo) y también 'La alimentación y educación de los hijos de uno solo de los cónyuges ... cuando convivan en el hogar familiar' (artículo 1.362, 1ª, segundo párrafo, primera parte)". M. Albaladejo, *Curso de Derecho Civil*, Barcelona, Ed. Bosch, págs. 148–149.

Se puede colegir que los gastos de hipoteca, agua, luz y mantenimiento del hogar conyugal, entre otros, forman parte de las cargas del matrimonio. Además, lo son también los gastos de comida y el trabajo en el hogar.

A estos efectos, en el ámbito de los alimentos, en *Mundo v. Cervoni*, 115 D.P.R. 422 (1984), determinamos que la labor y energía realizada por la mujer al preparar y servir la comida familiar, mantener la casa limpia y ordenada, y llevar los niños a la escuela y al médico, equivalían a su aportación en el deber solidario de ayuda recíproca de ambos cónyuges, y con el sostenimiento de la familia y de cualquiera de los cónyuges.([17]) Nada obsta que, como norma general, el trabajo de la casa se considere una clara aportación a las cargas del matrimonio.([18])

El *deber de socorro y ayuda mutua* entre cónyuges puede traducirse también "en la obligación de cada esposo de asistir al otro en su negocio o profesión, colaborando por él en la medida que exigen las circunstancias personales,

---

([17]) A la luz de dicha norma, concluimos "que al liquidar los gananciales un alimentante podrá reclamar crédito contra el otro obligado, sólo por los pagos en exceso de la justa pensión acordada o fijada por el tribunal y que la labor personal de un cónyuge que al administrar la pensión la convierte y destina a todo lo que es *indispensable para el sustento, habitación, vestido y asistencia médica de sus hijos debe estimarse como descargo de su propia obligación de alimentar* y constituye elemento apreciable por el juzgador al dirimir la reclamación de crédito entre alimentantes solidarios". (Cita omitida y énfasis suplido.) *Mundo v. Cervoni*, 115 D.P.R. 422, 424 (1984).

([18]) A tono con esta visión, en España, bajo ciertas circunstancias, al disolverse el matrimonio, el cónyuge que *realice trabajo para la casa tendrá* derecho a una indemnización.

Procede:

"1.º Si se estaba trabajando para la casa (a lo que probablemente debe equipararse que aun no trabajando para la casa, y desocupado así, no se trabaje fuera por deseo del otro esposo), y no sólo por el hecho de que se hubiese trabajado antes. Por ejemplo, inicialmente el matrimonio carecía de medios suficientes, luego los llega a conseguir, y así se descarga a la esposa de las faenas domésticas. De modo que podría trabajar fuera si quisiese. Y haciéndolo, no perdería su mantenimiento al cesar el matrimonio. Siendo injusto el que no haciéndolo por su voluntad, simplemente por haber trabajado antes para la casa, tenga derecho a compensación.

"2.º Si no se toma un trabajo, ya fuera de la casa, que proporcione al cónyuge que sea los ingresos que de haber cobrado, le habría dado el trabajo para la casa.

"3.º Si se trata de cesación del matrimonio, no de que éste pase de un régimen de bienes (el de separación, que se extingue) a otro. Pues si se pasa al de participación es como seguir bajo el de separación, salvo que se adquiere el derecho a participar en las ganancias del otro esposo. Y si se pasa al de gananciales, las cargas, y, entre ellas, el mantenimiento del cónyuge que tendría derecho a la compensación final, se levantarán con los bienes comunes, formando parte de éstos todos los ingresos del otro esposo, sin necesidad de que el primero contribuya con rendimientos obtenidos en trabajo fuera de casa." (Énfasis suprimido.) Albaladejo, *op. cit.*, págs. 202–203.

familiares y económicas de la familia". Lacruz Berdejo, *op. cit*, pág. 140. Con mayor especificidad nos ilustra:

> Si el régimen es de *separación absoluta*, la colaboración del cónyuge no titular [en el negocio del otro] puede ser contada como una *"contribución indirecta a las cargas del matrimonio"*, o sea, a través de los beneficios que produzca la empresa o profesión de su consorte. Pero *una aportación de trabajo a dicha empresa o profesión fuera de la medida requerida por el deber de ayuda mutua y el de contribuir debería permitir al colaborador reclamar una retribución*. Piénsese, por ejemplo, en que tenga un comercio el marido cuya mujer desempeña los quehaceres domésticos y todavía contribuye a los gastos comunes con las rentas de unos pisos de su propiedad que ella administra. La colaboración de ésta en el comercio podría interpretarse como cumplimiento del deber de socorro si se produce esporádicamente en temporadas o momentos de agobio, *pero prestada de modo continuo y en jornada normal supondría más bien un contrato tácito de trabajo*. El caso es más apremiante cuando el cónyuge, para prestar la ayuda en cuestión, ha renunciado a una colocación o empleo. En la doctrina alemana *la solución se hace depender de si se ha excedido o no la medida de la "colaboración usual"*, apuntando unos autores en caso afirmativo a la relación de trabajo, y otros al contrato de sociedad. (Énfasis suplido.) Íd., pág. 141.

En otras palabras, *de ordinario*, la aportación de la actividad de un cónyuge en el negocio del otro se calificará como una prestación gratuita o expresión de la mutua ayuda debida entre los cónyuges, *excepto cuando exceda lo razonable*. Quien *más allá* de esa medida de *razonabilidad* convierta al cónyuge en su empleado, se expone a las consecuencias de tener que retribuirlas como aportaciones en colaboración.

Bajo este prisma, no se discute que la señora Rivera Pérez realizó un trabajo para el hogar conyugal.[19] También lo hizo en el negocio del señor Cruz Ayala. Ahora bien, de su deposición en evidencia surge que el señor Cruz

---

[19] Surge de la deposición que ella "lava[ba], plancha[ba], cocina[ba], prepara[ba] desayuno, limpia[ba] mi apartamento todo eso lo hacía esta servidora, porque yo en mi casa no tenía ni una sirvienta". Apéndice, *Exhibit* 5, pág. 29.

Ayala la remuneraba y pagaba un *sueldo regular semanal* por sus gestiones en el negocio.([20]) Más aún, él sostenía *exclusivamente* las cargas económicas del matrimonio, ya que satisfacía y pagaba *todos* los gastos diarios de la casa, luz, agua, comida, y *cubría además los gastos personales de ella.* Además, la señora Rivera Pérez, luego de casarse, renunció *voluntariamente* a su trabajo como asistente del Dr. Carlos Matos,([21]) para conveniencia del matrimonio. Respondió así al deber expreso de socorro y cooperación mutua entre cónyuges.([22])

---

([20]) "P. Usted trabajó con él en el negocio?

"R. Sí yo trabajé.

"P. Y le pagaba un sueldo?

"R. *Sí el me pagaba,* pues me daba cien dólares semanales.

"P. Cien dólares semanales?

"R. Pero eso no recompensaba tanto el trabajo que yo tenía en el negocio.

"P. Bueno entonces no le sobraba nada de eso en otras palabras?

"R. Porque, pues, *menos mal que él pagaba los gastos de la casa, de la luz, el agua, y eso, eso era para mis gastitos personales.*

"P. Para *sus gastos personales, la luz, el agua, la comida, todo eso lo pagaba él,* o lo cogían en el supermercado?

"R. *Sí, señor.*

"P. *Entonces lo pagaba el supermercado, directamente o indirectamente lo pagaba él.* Le pregunto yo a usted si en la ocasión en que se compró esa casa, de dónde salieron los quince mil pesos que se pagaron de préstamo, quién los pagó?

"R. De dónde salieron?

"P. De dónde salieron los quince mil que dice la escritura se pagaron de pronto, quién los pagó?

"R. Del apartamento.

"P. Si?

"R. Bueno él lo pago, entre los dos lo compramos.

"P. Si por eso si pero...

"R. Sí, pero yo no tenía quince mil pesos.

"P. Usted no tenía dinero?

"R. Pero yo trabajaba con él, me fajaba trabajando en el negocio. Todo lo hacíamos juntos entre los dos, yo le ayudé mucho a levantar el negocio. Este cuando yo llegué a trabajar con él en el negocio estaba un poquito por el piso. Yo le ayudé a él a levantarlo lo que las ventas aumentaron, el negocio estuviera bien organizado, me fajaba allí casi hasta las 9:30 de la noche y hasta las 10:00 de la noche y en el tiempo de navidad a veces salía a las 11:00 de la noche de allí, porque ese negocio movía bastante dinero." (Énfasis suplido.) Apéndice, *Exhibit* 5, pág. 23.

Más áun, de la transcripción de evidencia surge que la señora Rivera Pérez *admitió* que estaba en la libreta de nómina del negocio de su esposo. *Íd.,* pág. 62.

([21]) Deposición sometida en evidencia. T.E., págs. 3-4.

([22]) "P. De 1982 ... cuando usted se casó con él usted trabajaba?

"R. Sí, señor.

Conforme a estos hechos no contradichos, la colaboración de la señora Rivera Pérez en el hogar conyugal y en el negocio del señor Cruz Ayala deben considerarse *como su aportación a las cargas del matrimonio*. Más allá de su sueldo regular recibido por su labor en el negocio del marido, no amerita una retribución. Difícilmente podemos caracterizarla como equivalente a una aportación a la comunidad ordinaria sobre el apartamento en el Condominio Solimar. Recalcamos, el señor Cruz Ayala lo pagó completo, satisfacía todos los gastos del hogar y cubría los gastos y las necesidades personales de la señora Rivera Pérez. Ade-

---

"P. Dónde trabajaba?

"R. Yo trabajaba con el Dr. Carlos R. Matos.

P. Le pregunto, como secretaria?

"R. Asistente.

"P. Cuánto ganaba?

"R. A tres treinta y cinco la hora.

"P. Cuántas horas a la semana trabajaba?

"R. Cuando trabajaba con él cuarenta horas.

"P. Le pregunto yo a usted que si de eso le sobraba dinero toda la semana o se lo gastaba todo?

"R. Bueno me sobraba *alguito* pero *no mucho* porque tenía que comprar y ...?

"P. No mucho ... cómo cuanto le sobraba a la semana?

"R. Yo exactamente *no recuerdo*.

"P. No sabe *pero no le sobraba mucho*." Págs. 3–4.

.     .     .     .     .     .

"P. Doña Yolanda, antes de casarse con el señor José Cruz Ayala, ¿cúal era su profesión?

"R. Yo, asistente dental.

"P. Luego de que usted se casa con él, usted continuó trabajando como asistente dental.

"R. El me pidió que yo abandonara mi trabajo de asistente dental, un trabajo que yo tenía por veinte y dos años y que lo perdí, para que me fuera ayudarle al negocio de él, Manantial Supermarket, porque él tenía el negocio un poquito desangraó y las cosas como que no estaban muy acá que digamos. Desde que yo empecé a trabajar con él, ahí aumentó, como yo soy una persona bien metódica y sencilla, ahí aumento la clientela, había mucha gente ahí en ese negocio, ya no cabía porque el negocio subió el volumen." T.E. pág. 50.

.     .     .     .     .     .

"P. Eso era lo mismo que ganaba.

"R. No, porque él a mi lo que me daba era un semanal de cien dólares.

"P. Cuando usted trabajaba antes de casarse con él, ganaba $3.35 también.

"R. Sí, en la nómina ponía así.

"P. Ganaba $3.35." T.E., pág. 79.

más, en cuanto al negocio, le pagaba regularmente a ella un sueldo semanal.

## V

Esta conclusión no dejaría huérfana a la señora Rivera Pérez de remedio.[23] Su dedicación al hogar y su colaboración en la empresa comercial de su esposo son criterios que se han de considerar en cuanto a su posible derecho a los alimentos *postdivorcio*, al amparo del Art. 109 del Código Civil, según enmendado por la Ley Núm. 25 de 16 de febrero de 1995 (31 L.P.R.A. sec. 385). *Díaz v. Alcalá*, 140 D.P.R. 959 (1996).

De vigencia inmediata, su texto nuevo modifica sustancial y significativamente el alcance y la visión legislativa de la pensión *post*divorcio. Dispone lo siguiente:

Si decretado el divorcio por *cualesquiera* de las causales que establece el [Art. 96 de este código,] cualesquiera de los ex cónyuges no cuenta con suficientes medios para vivir, el Tribunal Superior podrá asignarle alimentos discrecionales de los ingresos, rentas, sueldos o bienes que sean de la propiedad del otro cónyuge.

El Tribunal concederá los alimentos a que se refiere el párrafo anterior, teniendo e cuenta, entre otras, las siguientes circunstancias:

(a) Los acuerdos a que hubiesen llegado los ex cónyuges.

(b) La edad y el estado de salud.

(c) La calificación profesional y las probabilidades de acceso a un empleo.

(d) *La dedicación pasada y futura a la familia.*

(e) *La colaboración con su trabajo en las actividades mercantiles, industriales o profesionales del otro cónyuge.*

(f) La duración del matrimonio y de la convivencia conyugal.

---

[23] Adviértase que subsiste la estipulación de las partes emitida en la sentencia de divorcio mediante la cual el señor Cruz Ayala pagará a la señora Rivera Pérez doscientos dólares ($200) mensuales en concepto de alimentos, continuará pagando la hipoteca y el mantenimiento del apartamento en cuestión, y ella es acreedora a usar el vehículo Honda.

(g) El caudal y medios económicos y las necesidades de uno y otro cónyuge.

(h) Cualquier otro factor que considere apropiado dentro de las circunstancias del caso. 31 L.P.R.A. sec. 385.

## VI

Finalmente, resolvemos que la mera comparecencia de ambos cónyuges en la escritura de compraventa del apartamento en el Condominio Solimar —*sin la señora Rivera Pérez haber hecho en ese momento o después aportación económica alguna*— no constituye donación válida de participación en el inmueble; tampoco lo hace la Carta de 1ro de junio de 1988 del señor Cruz Ayala.

Las donaciones entre cónyuges están *expresamente prohibidas*, excepto cuando sean *regalos módicos* en ocasiones de *regocijo para la familia*.[24] Esta limitación estatutaria es suficiente para percatarnos de que la alegada donación[25] del apartamento valorado en $35,129.10,[26] no es

---

[24] El Art. 1286 del Código Civil dispone:

"Será nula *toda* donación entre los cónyuges durante el matrimonio.

"No se incluyen en esta regla los regalos módicos que los cónyuges se hagan *en ocasiones de regocijo para la familia*." (Énfasis suplido.) 31 L.P.R.A. sec. 3588.

[25] Cabe señalar que el Art. 1347 del Código Civil establece que "[e]l marido y la mujer no podrán *venderse* bienes recíprocamente, *sino cuando se hubiese pactado la separación de bienes*, o cuando hubiera separación judicial de los mismos bienes, autorizada con arreglo [al capítulo 275] de este título". (Énfasis suplido.) 31 L.P.R.A. sec. 3772.

Contrario a lo que señaló la señora Rivera Pérez en su Memorándum de 8 de octubre de 1993 al tribunal de instancia, este precepto *no aplica*, pues sólo se refiere al negocio de *compraventa* entre cónyuges; *no permite donación*.

A estos efectos, nos dice Manresa, *op. cit.*, pág. 989:

"Puede y debe sostenerse la prohibición de donar uno de los cónyuges al otro durante el matrimonio [existente el régimen de separación de bienes], porque éste es el espíritu absoluto del artículo 1.334, [equivale al Art. 1286 nuestro,] como hicimos notar en su lugar, pero no caben las demás prohibiciones."

[26] En cuanto al vehículo marca Honda de 1985 a que se refiere el señor Cruz Ayala en su Carta de 1ro de junio de 1988, surge de los autos que éste aceptó traspasárselo en *transacción*.

un regalo módico y, ciertamente, no se hizo en ocasión de regocijo para la familia.

Confirmaríamos la sentencia recurrida.